## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DIANA LEACH, on behalf of herself and a class of persons similarly situated, | X |
| Plaintiff, | CLASS ACTION  *CA 09 383ML* |
| v. | COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATION OF ERISA DISCLOSURE REQUIREMENTS |
| TEXTRON INC.; TERRENCE O'DONNELL; DOUGLAS STEWART; NANCY GILMAN; AND; JOHN DOES 1-20, | |
| Defendants. | JURY TRIAL DEMANDED |

X

DIANA LEACH, on behalf of herself and a: class of persons similarly situated,

Plaintiff,

v.

TEXTRON INC.; TERRENCE O'DONNELL;: DOUGLAS STEWART; NANCY GILMAN,: AND; JOHN DOES 1-20,

Defendants.

X

## COMPLAINT

Plaintiff Diana Leach ("Plaintiff"), on behalf of herself and on behalf of a class consisting of similarly situated participants and beneficiaries (the "Participants") of the Textron Savings Plan (the "Plan"), by hers attorneys, alleges the following for her Complaint (the "Complaint"). The allegations contained herein are based on the investigation of counsel, except for those allegations pertaining to the Plaintiff, which are based upon personal knowledge. Plaintiff may, after discovery and/or disclosure proceedings in this case, seek leave to amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1.       Plaintiff, who was a Participant in the Plan, brings this civil enforcement action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of common stock of Textron Inc. (hereinafter "Textron" or the "Company") at any time from December 31, 2006 to January 29, 2009, inclusive

(the period from December 31, 2006 to January 29, 2009, inclusive being hereinafter referred to as the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Class pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3). As more fully set forth below, Defendants breached their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550. Defendants breached their fiduciary duties to the Participants in various ways, including, but not limited to, (i) misrepresenting and failing to disclose material facts to the Participants in connection with the administration of the Plan; (ii) failing to exercise their fiduciary duties to the Participants solely in the interests of the Participants for the exclusive purpose of providing benefits to Participants and their beneficiaries; (iii) failing to manage the Plan's assets with the care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently failing to diversify the investments in the Plan so as to minimize the risk of large losses; and (v) permitting the Participants to continue to elect to invest their retirement monies in Textron common stock when the market price of Textron common stock was artificially inflated, when it was imprudent to do so, and when the Participants were not provided with timely, accurate and complete information concerning the Company as required by applicable law. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are personally liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiff seeks other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, restitution, and other monetary relief. Insofar as any Defendant is sued alternatively as a knowing participant in a breach of fiduciary duty for equitable relief, Plaintiff intends to proceed pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

## JURISDICTION AND VENUE

2.      Plaintiff's claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

3.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

5.      Plaintiff is a resident of the State of Texas.  Plaintiff was a Participant in the Plan at times relevant to the Complaint and maintained an investment in Textron common stock in her individual account in one of the Plan during the Class Period.

6.      Defendant Textron Inc. is a multi-industry company with a global network of aircraft, defense, industrial and finance businesses to provide customers with solutions and services around the globe. The Company operates its business through five operating segments. Four of the Company's operating segments represent its manufacturing businesses: Cessna, Bell, Textron Systems and Industrial. The fifth segment consists of its Finance business. Cessna has four major product lines: Citation business jets, Caravan single engine turboprops, Cessna single engine piston aircraft and aftermarket services. Textron Systems provides products to the defense, aerospace and general aviation markets. The Industrial segment includes the Company's Kautex, Greenlee, E-Z-GO and Jacobsen businesses. The finance segment consists of Textron Financial Corporation, a diversified commercial finance company. The Company is incorporated in Delaware and maintains its principal place of business at 40 Westminster Street, Providence, RI 02903. Textron was a Plan fiduciary and is liable herein because of its own conduct and inaction as Plan Sponsor, because of its

authority over Plan investment options, as well as under the doctrine of respondeat superior (because the fiduciaries, identified below, were Textron employees). Additionally, the Company was a Plan fiduciary at all relevant times because it was the Plan's administrator, as set forth in the Plan's 2007, 2008, and 2008 Forms 11-Ks.

7.       At times relevant to this Complaint, Defendant Terrence O'Donnell ("O'Donnell") was a plan fiduciary. Defendant Chaplin signed the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2006, which was filed with the SEC on or about June 28, 2007 (the "2007 11-K"), the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2007, which was filed with the SEC on or about June 26, 2008 (the "2008 11-K"), and the Plan's Form 11-K Annual Report for the fiscal year ended December 31, 2008, which was filed with the SEC on or about June 26, 2009 (the "2009 11-K"), all on behalf of the Plan as the Company's Executive Vice President and General Counsel.  Defendant O'Donnell signed each of the 2007 11-K, 2008 11-K and 2009 11-K on behalf of Textron, as Plan Administrator for the Textron Savings Plan.

8.       At times relevant to this Complaint, Defendant Douglas Stewart ("Stewart") served as a Human Resources Compliance Officer for the Company.  Defendant Stewart was a Plan fiduciary at times relevant to this Complaint.  Defendant Stewart signed the Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan for fiscal year 2007, dated on October 16, 2008 (the "2007 5500") in his capacity as employer, plan sponsor or DFE and Defendant Stewart signed the Plan's Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan for fiscal year 2006, dated on December 6, 2007 (the "2007 5500") as both "plan administrator" and "as employer, plan sponsor or DFE as applicable."  Liability is only asserted against Defendant Stewart for such periods of time as the Defendant Stewart acted as a fiduciary with respect to the Plan.

9.       At times relevant to this Complaint, Defendant Nancy Gilman ("Gilman") served as a

4

Plan fiduciary. Defendant Gilman signed the 2007 5500 as "plan administrator." Liability is only asserted against Defendant Gilman for such periods of time as Defendant Gilman acted as a fiduciary with respect to the Plan.

10.   John Does 1-20 were the committee(s) and individual members of any committee(s) which administered the Plan on behalf of the Company. The identity of any committee(s) and the members of any such committee(s) which was or were responsible for carrying out the provisions of the Plan is currently not known. On information and belief, the Doe Defendants were directors and/or officers of the Company and knew or should have known of the Company's problems as described herein.

## CLASS ACTION ALLEGATIONS

11.   Plaintiff brings this action on her own behalf and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of Textron common stock (including in the form of Textron common stock or units of the Textron Stock Fund (the "Fund")) at any time during the Class Period (the "Class").

12.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at minimum, hundreds of members of the Class. The Form 5500 Annual Return/Report of Employee Benefit Plan for the Plan for fiscal year 2007 states that there were 41,617 Plan participants as of December 31, 2006 and there were 38,884 as of December 31, 2007.

13.   Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the

5

questions of law and fact common to the Class are:

        (a)     Whether Defendants were fiduciaries to Plaintiff and the other members of the Class;

        (b)     Whether Defendants breached their fiduciary duties to Plaintiff and the other members of the Class;

        (c)     Whether the Plan and its Participants were injured by such breaches; and

        (d)     Whether the Class is entitled to damages and injunctive relief.

    14.    Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and all the other members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

    15.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other class members.

    16.    Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

    17.    Questions of law and questions of fact which are common to the members of the class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into

account:

    (a)    the interest of members of the class in individually controlling the prosecution or defense of separate actions;

    (b)    the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

    (c)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (d)    the difficulties likely to be encountered in the management of a class action.

18.    Moreover, because the damages suffered by many of the Participants will be relatively small, the expense and burden of individually litigating their rights would make it impossible to individually redress the wrongs alleged herein.

19.    The claims herein are under ERISA and related principles of federal common law cannot be asserted by the plaintiffs in derivative actions against the company or in class actions under securities law.

20.    Under and as required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the defendants in any other actions.

<b><u>DESCRIPTION OF THE PLAN</u></b>

21.    At all times relevant to this Complaint, the Plan was an employee benefit Plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

22.    At all times relevant to this Complaint, the Plan was a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any

7

forfeitures of accounts of other Participants which were allocated to such Participant's accounts.

23.     At all times relevant to this Complaint, the Plan provided a number of different options for investment of the Plan's assets, including Textron common stock.

24.     At all times relevant to this Complaint, Participants were allowed to direct the Plan to purchase investments from among the investment options available under the Plan and allocate them to their individual accounts.

25.     The 2007 11-K, 2008 11-K and 2009 11-K were each caused to be filed by Textron Inc., in its capacity as Plan Administrator.

26.     The 2007 11-K, states, among other things:

**1.     Description of Plan**

**General**

The Textron Savings Plan (the "Plan") is primarily an employee stock ownership plan covering all eligible domestic employees of Textron Inc. ("Textron"), as defined in the Plan. The remainder of the Plan is a profit-sharing and 401(k) plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and was amended and restated effective November 1, 1999, and further amended through 2005, to reflect the requirements of recent legislation affecting statutory changes and regulations and other plan changes.

The Plan is currently administered under the terms of a Trust Agreement, dated December 1, 2004, with Fidelity Management Trust Company (the Trustee or Fidelity). Fidelity also serves as the Plan's recordkeeper.

**Investment Options**

Participants may elect to direct their employee contributions to the following funds: The Textron Stock Fund, PIMCO Total Return Fund, Vanguard High-Yield Corporate Fund, Fidelity Equity Income Fund, Vanguard Institutional Index Fund, Fidelity Blue-Chip Growth Fund, Fidelity Small Cap Stock Fund, Fidelity Diversified International Fund, Vanguard Developed Markets Index Fund, Vanguard Strategic Equity Fund, a number of Fidelity Freedom Funds

8

(with various targeted retirement dates) and the Textron Stable Value Fund.

**Contributions**

Participants of the Plan are entitled to elect compensation deferrals up to 40% of their eligible compensation, within the limits prescribed by Section 401(k) of the Internal Revenue Code (the "Code"). Participants may also contribute amounts representing distributions from other qualified employer retirement plans. Participants' pre-tax and after-tax contributions, which are matched 50% up to 5% of eligible compensation by Textron subject to certain ERISA restrictions and plan limits, are recorded when Textron makes payroll deductions from participants' wages.

\* \* \*

Effective January 1, 2006, the Plan was amended to provide that newly eligible employees who do not affirmatively elect either to participate in the Plan or to decline participation in the Plan, will automatically be enrolled in the Plan, and will defer three percent of their eligible compensation into the Plan.

\* \* \*

Employer contributions are invested entirely in the Textron Stock Fund. Employees have the ability to subsequently reallocate matching contributions among any of the investment options offered in the Plan.

27.    The 2008 11-K, states, among other things:

1.    **Description of Plan**

**General**

The Textron Savings Plan (the "Plan") is primarily an employee stock ownership plan covering all eligible domestic employees of Textron Inc. ("Textron"), as defined in the Plan. The remainder of the Plan is a profit-sharing and 401(k) plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and was amended and restated effective November 1, 1999, and further amended through 2007, to reflect the requirements of recent legislation affecting statutory changes and regulations and other plan changes.

The Plan is currently administered under the terms of a Trust Agreement, dated December 1, 2004, with Fidelity Management Trust Company (the Trustee or Fidelity). Fidelity also serves as the Plan's recordkeeper.

**Investment Options**

Participants may elect to direct their employee contributions to the following funds: The Textron Stock Fund, PIMCO Total Return Fund, Vanguard High-Yield Corporate Fund, Fidelity Equity Income Fund, Vanguard Institutional Index Fund, Fidelity Blue-Chip Growth Fund, Fidelity Small Cap Stock Fund, Fidelity Diversified International Fund, Vanguard Institutional Developed Markets Index Fund, Vanguard Strategic Equity Fund, a number of Fidelity Freedom Funds (with various targeted retirement dates) and the Textron Stable Value Fund.

**Contributions**

Participants of the Plan are entitled to elect compensation deferrals up to 40% of their eligible compensation, within the limits prescribed by Section 401(k) of the Internal Revenue Code (the "Code"). Participants may also contribute amounts representing distributions from other qualified employer retirement plans. Participants' pre-tax and after-tax contributions, which are matched up to 50% up to 5% of eligible compensation by Textron subject to certain ERISA restrictions and plan limits, are recorded when Textron makes payroll deductions from participants' wages.

* * *

Effective January 1, 2006, the Plan was amended to provide that newly eligible employees who do not affirmatively elect either to participate in the Plan or to decline participation in the Plan, will automatically be enrolled in the Plan, and will defer three percent of their eligible compensation into the Plan. An employee is eligible immediately when hired.

* * *

Employer contributions are invested entirely in the Textron Stock Fund. Employees have the ability to subsequently reallocate matching contributions among any of the investment options offered in the Plan.

28.  The 2009 11-K, states, among other things:

## 1.   Description of Plan

### General

The Textron Savings Plan (the Plan) covers all eligible domestic employees of Textron Inc. (Textron), as defined in the Plan. The Plan invests in the Textron Stock Fund along with other mutual funds and Guaranteed Investment Contracts. The portion that invests in the Textron Stock Fund is an employee stock ownership plan. The remainder of the Plan is a profit-sharing and 401(k) plan. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA) and was amended and restated effective November 1, 1999, and further amended through 2009, to reflect the requirements of recent legislation affecting statutory changes and regulations and other plan changes.

The Plan is currently administered under the terms of a Trust Agreement, dated December 1, 2004 (as amended January 1, 2009), with Fidelity Management Trust Company (the Trustee or Fidelity). Fidelity also serves as the Plan's recordkeeper.

### Investment Options

Participants may elect to direct their employee contributions to the following funds: The Textron Stock Fund, PIMCO Total Return Fund, Vanguard High-Yield Corporate Fund, Vanguard Institutional Index Fund, Vanguard Institutional Developed Markets Index Fund, Vanguard Strategic Equity Fund, Fidelity Equity Income Fund, Fidelity Blue-Chip Growth Fund, Fidelity Small Cap Stock Fund, Fidelity Diversified International Fund, a number of Fidelity Freedom Funds (with various targeted retirement dates) and the Textron Stable Value Fund.

### Contributions

Participants of the Plan are entitled to elect compensation deferrals up to 40% of their eligible compensation, within the limits prescribed by Section 401(k) of the Internal Revenue Code (the Code). Participants may also contribute amounts representing distributions from other qualified employer retirement plans. Participants' pre-tax and after-tax contributions, which are matched up to 50% up to 5% of eligible compensation by Textron subject to certain ERISA restrictions and plan limits, are recorded when Textron makes payroll deductions from participants' wages.

\* \* \*

11

Eligible employees are subject to automatic enrollment on the 60th day after their date of hire, if they have not specifically elected to be excluded from the plan. The automatic enrollment is for 3% of eligible compensation per pay period. An employee who is automatically enrolled may elect to change or suspend their enrollment in the plan at any time.

* * *

Employer contributions are invested entirely in the Textron Stock Fund. Employees have the ability to subsequently reallocate matching contributions among any of the investment options offered in the Plan.

29.     The 2007 11-K, 2008 11-K, and 2009 11-K also represent that approximately $1,167,869,000 of the Plan's total investments of $2,367,593,000, or approximately 49% of the investments of the Plan, were invested in Textron common stock as of December 31, 2006,  that approximately $1,611,547,000 of the Plan's total investments of $2,968,360,000, or approximately 54% of the investments of the Plan, were invested in Textron common stock as of December 31, 2007,  and that approximately $389,220,000 of the Plan's total investments of $1,387,058,000, or approximately 28% of the investments of the Plan, were invested in Textron common stock as of December 31, 2008.

30.     During the Class Period, the market price of Textron common stock was artificially inflated due to the concealment of Textron's true financial and operating condition as described herein.  Throughout the Class Period, Textron common stock was not a prudent investment for the Participants' individual retirement accounts under the Plan.  If Defendants had made full disclosure to the Participants of Textron's true financial and operating condition, as described herein, the Participants would not have chosen Textron common stock as an investment option under the Plan to the extent that they did.  Indeed, had the truth been disclosed to the Participants, Textron common stock would not have been chosen by many Participants as an investment option at all.

## ADMINISTRATION OF THE PLAN

31.     Defendants, as fiduciaries of the Plan, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101 (29 U.S.C. § 1021) requires the Plan's Administrator to furnish Summary Plan Descriptions ("SPD") to Participants.  ERISA Section 102, 29 U.S.C. § 1022 provides that an SPD must apprise Participants of their rights and obligations under a plan.  In addition, every person who held Textron stock in a Plan account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of Textron, as well as important information concerning Textron's Directors and senior executives.

32.     At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plan's assets allocated to their accounts.

33.     At all times relevant to this Complaint, Defendants had a duty to review the Plan's investment policies and the selection and the performance of investment alternatives offered under the Plan.  There was no requirement that any assets of the Plan be invested in Company stock or that Company stock be continued as an investment alternative.

34.     At all times relevant to this Complaint, Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plan.

35.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plan.

36.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## BRACHES OF FIDUCIARY DUTY

37.     As required by ERISA, Defendants issued one or more SPDs, each of which either referred to or incorporated by reference the documents filed by Textron with the SEC under the federal securities laws. These filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading.

38.     In particular, Textron was an imprudent retirement investment for the Plan during the Class Period because of, *inter alia*, the facts that:

        (a)     The Company's Class Period forecasts contained in the SPD or in documents incorporated by reference in the SPDs were unreasonably over-optimistic in light of market conditions;

        (b)     The Company's "record backlogs" contained in the SPD or in documents incorporated by reference in the SPDs of Cessna orders were not as firm as Defendants' led Participants to believe which undermined the reasonableness of the forecasts referenced above;

        (c)     The Company did not timely write down assets due to generally poor debt management ensured that the assets of its finance segment were materially overstated;

        (d)     The Company's credit ratings would necessarily suffer as a result of material overstatements in the Company's finance segment when the deterioration began to be reported to the investing public;

        (e)     as a result of the above and other facts, the Company's projections were skewed and its ability to generate future revenue were severely jeopardized;

(f)     the Company lacked the required internal controls, and, as a result, the Company's projections were based upon defective assumptions; and,

(g)     as a result of the above, the Company's stock was both artificially inflated nd an imprudent retirement investment.

39.     Defendants were not obligated by ERISA or by the Plan to discharge their duty to provide information to Participants through the mechanism of incorporation of SEC filings. Defendants could have fulfilled this duty by setting forth sufficient and accurate information in the SPDs themselves, and updating such information as appropriate.  Defendants chose, however, to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings contained materially false and misleading information which caused loss to the Plan and the Participants as set forth above.

40.     At all relevant times, Defendants knew or should have known that Company stock was an imprudent retirement investment for the Participants and the Plan.

41.     At all relevant times, Defendants knew or should have known of the material misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

## FACTUAL ALLEGATIONS

42.     Before the start of, and during the Class Period, Textron played a role in Saddam Hussein's wide-reaching scheme to profit from the Oil-for-Food program in which Textron paid bribes to the Iraqi government.  In late August of 2007, Textron agreed to pay $1.15 million as part of an agreement with the U.S. Department of Justice, and an additional $3.5 million to resolve charges filed by the U.S. Securities and Exchange Commission in U.S. District Court in Washington.

43.     On January 18, 2007, the Company filed a Form 8-K with the SEC.  The January 18,

2007 Form 8-K contained as an exhibit, a press release the Company issued on January 18, 2007 entitled Textron Comments on Fourth Quarter 2006 Earnings Outlook. The press release stated, in pertinent part, that the Company "has incurred additional costs related to its Bell Helicopter H-1 program during the fourth quarter of 2006. *However, stronger financial performance at Cessna, Textron Systems and Textron Financial*, plus a lower tax rate, more than offset the additional H-1 costs booked in the quarter. This will result in reported fourth quarter earnings per share from continuing operations in excess of the company's previous guidance range of $1.35 - $1.45." (emphasis added).

44. On April 19, 2007, the Company filed a Form 8-K with the SEC. The April 19, 2007 Form 8-K contained as an exhibit a press release the Company issued on April 17, 2007 entitled "Textron Delivers Strong First Quarter Results; Reports EPS from Continuing Operations of $1.55 compared to $1.19 a Year Ago; Books 122 New Business Jet Orders; Increases 2007 Expected EPS from Continuing Operations Range by $0.20". The press release stated in pertinent part as follows:

> Textron Inc. (NYSE: TXT) today reported a 30% increase in earnings per share from continuing operations on a 12.6% revenue increase. The company also raised earnings guidance for 2007, reflecting continued expectations of solid top-line growth and strong operational performance.
>
> "We outperformed again this quarter with strong organic revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell. "Demand for our products and further improvements in enterprise management continue to drive enhanced results," Campbell added.
>
> * * *
>
> Revenues at Cessna increased $99 million primarily due to Citation business jet mix and favorable pricing.
>
> Segment profit increased $38 million as a result of higher pricing and mix, partially offset by inflation and increased development expenses.

Cessna's backlog increased to $9.0 billion at the end of the first quarter from $8.5 billion at the end of last year.

45.     On July 19, 2007, the Company filed a Form 8-K with the SEC. The July 19, 2007

Form 8-K contained as an exhibit a press release the Company issued on July 19, 2007 entitled

"Textron Reports Strong Second Quarter Results; EPS from Continuing Operations of $1.69

Compared to $1.34 a Year Ago; Increases 2007 Expected EPS Range by $0.25 and Free Cash Flow

by $50 Million; Board Authorizes Two-for-One Stock Split, 19% Increase to Annualized Dividend

Rate and New Share Repurchase Program." The press release stated in pertinent part as follows:

> Textron Inc. (NYSE: TXT) today reported a 26% increase in earnings per share from continuing operations on a 15% revenue increase. The company also raised earnings and cash flow guidance for 2007.
>
> "We experienced another strong quarter of solid revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell. "Demand for our products and further improvements from our Enterprise Management initiatives continue to drive enhanced results," Campbell added.
>
> * * *
>
> Textron's Board of Directors announced that it has approved a stock split, an increase in the common stock dividend and a new share repurchase program.
>
> "These actions by our Board demonstrate confidence in our ability to execute and underscore the company's commitment to value creation through a balanced strategy of growth and returning cash to the shareholder," said Campbell.
>
> * * *
>
> (Per-share amounts are stated on a pre-split basis.) Campbell added, "Given the strength of demand for our innovative products and our progress in execution improvement thus far, we are raising our earnings and cash flow outlook for the year."
>
> Textron expects full-year 2007 revenues will be up about 12% from last year, while earnings per share from continuing operations are now expected to be between $6.35 and $6.55, $0.25 per share higher

than its previous guidance. Third quarter earnings per share from continuing operations are expected to be between $1.45 and $1.55. The company now expects full-year 2007 free cash flow to be in the range of $550 - $600 million, up $50 million from its previous expectation.

* * *

Revenues at Cessna increased $198 million in the second quarter due to higher volume, primarily related to Citation jets, and pricing. Cessna delivered 95 Citation business jets in the quarter compared to 76 in the second quarter of 2006. Segment profit increased $47 million due to higher pricing and the impact of the higher volume, partially offset by inflation and increased product development expenses.

Cessna's backlog increased to $10.4 billion at the end of the second quarter of 2007, compared to $9.0 billion for the last quarter.

46.    On October 18, 2007, the Company filed a Form 8-K with the SEC.  The October 18, 2007 Form 8-K contained as an exhibit a press release the Company issued on October 18, 2007. entitled "Textron Reports Strong Third Quarter Results on 15% Year-Over-Year Revenue Growth; EPS from Continuing Operations of $0.95 Compared to $0.68 a Year Ago; Increases Expected 2007 EPS from Continuing Operations Range by $0.22 and Free Cash Flow by $50 Million Books 609 New Business Jet Orders to Date."  The press release stated in pertinent part as follows:

Textron Inc. (NYSE: TXT) today reported a 40% increase in earnings per share from continuing operations on a 15% revenue increase.

"Once again, we delivered an excellent quarter with strong organic revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell. "Our sustained strong operating performance allowed us to exceed our financial targets while continuing to invest in our longer-term growth."

Third quarter 2007 revenue was $3.3 billion, up 15% from last year. Third quarter 2007 income from continuing operations was $0.95 per share, compared to $0.68 in the third quarter of 2006. Including discontinued operations, third quarter 2007 net income was $1.00 per share compared to $0.66 a year ago.

* * *

Campbell added, "We see strong end-market demand continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy, positions us to deliver significant growth in earnings, cash flow and shareholder value."

* * *

Revenues at Cessna increased $218 million due to higher volume, primarily related to Citation business jets, and higher pricing.

Segment profit increased $60 million due to higher pricing and volume, partially offset by inflation and increased product development expenses.

Cessna's backlog hit another all-time high of $11.9 billion at the end of the third quarter of 2007, up $1.5 billion from the end of the second quarter.

* * *

Revenues in the Finance segment increased $2 million primarily due to an increase in securitization and other fee income and higher average finance receivables. These increases were largely offset by the impact of a transaction in 2006 associated with a leveraged lease asset and market pricing pressures.

Profit in the Finance segment increased $1 million due to an increase in securitization and other fee income and a decrease in the provision for losses, partially offset by the impact of the 2006 leveraged lease transaction and higher operating expenses. The decrease in provision for losses is primarily attributable to lower growth in the receivable portfolio during the third quarter of 2007.

47.    On January 24, 2008, the Company filed a Form 8-K with the SEC. The January 24, 2008 Form 8-K contained as an exhibit a press release the Company issued on January 24, 2008 entitled "Textron Reports 32 Percent Increase in Fourth Quarter Earnings Per Share on 18 Percent Revenue Growth; Reports EPS from Continuing Operations of $1.02 compared to $0.77 a Year Ago; Books 164 New Business Jet Orders During Fourth Quarter; Sets New Record with 773 Jet Orders in 2007; Announces Approval of Large Cabin Citation Jet; Expects 2008 EPS from Continuing

Operations Range of $3.75 to $3.95; Up from $3.59 in 2007." The press release stated in pertinent part as follows:

> Textron Inc. (NYSE: TXT) today reported strong fourth quarter results with a 32% increase in earnings per share from continuing operations on an 18% revenue increase. Cash flow provided by continuing operations for the full-year was $1.2 billion, resulting in free cash flow of $796 million. The company generated a 24.8% return on invested capital for 2007, up 800 basis points from last year.

> "Our fourth quarter culminates a year of powerful performance at Textron on many fronts. The positive impact of our ongoing journey to become the premier multi-industry company is apparent in our top-line growth and our ability to convert that growth into profits and premium shareholder returns," said Textron Chairman, President and CEO Lewis B. Campbell.

> Fourth quarter 2007 income from continuing operations was $1.02 per share, compared to $0.77 in the fourth quarter of 2006. Including discontinued operations, fourth quarter 2007 net income was $1.00 per share compared to $0.76 a year ago. Fourth quarter 2007 revenue was $3.8 billion, compared to $3.2 billion last year.

> Full-year 2007 income from continuing operations was $3.59 per share, compared to $2.71 a year ago. Including discontinued operations, 2007 full-year net income was $3.60 per share, compared to $2.31 last year.

> \* \* \*

> 2008 Outlook

> Textron expects 2008 revenues to be about $15 billion, up 13%, and earnings per share to be between $3.75 and $3.95. First quarter earnings per share are forecasted to be between $0.75 and $0.85 per share. Textron's outlook fully includes the 2008 development costs for the large cabin Citation program.

> The company expects 2008 free cash flow in the range of $700 - $750 million, reflecting expected capital expenditures of about $550 million.

> Campbell commented, "While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, *we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial.*

20

> *Even with the softer U.S. economy, we expect another banner year of business jet orders exceeding current year deliveries. Given that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron."* [emphasis added]

* * *

> Cessna revenues and segment profit increased $329 million and $75 million, respectively, in the fourth quarter of 2007. Revenues increased due to higher volumes and higher pricing. Segment profit increased due to the higher pricing, the impact of higher volume and favorable warranty performance, partially offset by inflation and increased product development expense.

48.     On April 17, 2008, the Company filed a Form 8-K with the SEC. The April 17, 2008 Form 8-K contained as an exhibit a press release  the Company issued on April 17, 2008 entitled "Textron Reports First Quarter EPS from Continuing Operations of $0.93, up 19.2 percent; Books 235 New Business Jet Orders; Record $22 Billion Aircraft and Defense Backlog Signals Strong Growth for Years to Come." The press release stated in pertinent part as follows:

> Textron Inc. (NYSE: TXT) today reported strong first quarter results with a 19.2 percent increase in earnings per share from continuing operations on a revenue increase of 18.7 percent. Cash flow provided by operating activities of continuing operations for the quarter was $158 million, resulting in free cash flow of $78 million.

> "Global demand continues to be brisk across our aircraft and defense businesses, which led to another significant expansion in our backlog during the quarter," said Textron Chairman, President and CEO Lewis B. Campbell. "We also had strong performance in our manufacturing operations, which is important as we expand our capacity to meet growing requirements for our products and services," Campbell added.

> First quarter 2008 income from continuing operations was $0.93 per share, compared to $0.78 in the first quarter of 2007. Including discontinued operations, first quarter 2008 net income was $0.91 per share compared to $0.77 a year ago. First quarter 2008 revenue was $3.5 billion, compared to $3.0 billion last year.

Reflecting strong demand in aircraft and defense, combined backlog at Cessna, Bell Helicopter and Textron Systems increased to $22.0 billion at the end of the quarter, up from $18.8 billion at the end of 2007.

2008 Outlook

Textron now expects 2008 earnings per share from continuing operations to be between $3.80 and $4.00, up $0.05 per share from our previous forecast. Second quarter earnings per share are expected to be between $0.90 and $1.00 per share. The company continues to expect free cash flow for the year in the range of $700 - $750 million.

\* \* \*

Cessna's revenues increased $278 million in the quarter from last year's same period reflecting delivery of 95 business jets compared to 67 in last year's first quarter, improved pricing and revenues from the acquisition of Columbia Aircraft.

Segment profit increased $52 million, reflecting higher volumes, improved pricing and favorable warranty performance, partially offset by inflation and increased engineering and product development expense.

Cessna backlog at the end of the first quarter was $14.5 billion, up from $12.6 billion at year-end 2007.

49.     On June 13, 2008, the Company filed a Form 8-K with the SEC.  The June 13, 2008

Form 8-K contained as an exhibit a press release  the Company issued on June 13, 2008 entitled

"Textron Updates Second Quarter EPS Forecast and Reaffirms Full-Year Forecast."  Textron

announced it would lower its earnings forecast for Q2 2008 because of significantly lower finance

segment results.  The press release stated in pertinent part as follows:

Textron Inc. (NYSE: TXT) reported today that it now expects 2008 second quarter earnings per share from continuing operations to be in the range of $0.93 to $0.98, compared to its previous forecast of $0.90 to $1.00. The company continues to forecast full-year earnings per share from continuing operations in the range of $3.80 to $4.00 and free cash flow of $700 - $750 million.

22

The company said that profit in its Finance segment would be significantly less than previously forecast. Lower profitability in Finance will result from higher second quarter pre-tax loan loss provisions of about $20 million and a pre-tax charge of about $10 million that will be recorded in the quarter related to Sale-In, Lease-Out (SILO) transactions previously challenged by the IRS. Weaker profit at Finance in the second quarter and for the full-year is expected to be offset primarily by higher profits in the aircraft and defense businesses.

"Despite further softening in our commercial finance business, 2008 is shaping up to be another very good year for Textron overall as we continue to see strong demand and performance at Cessna, Bell Helicopter and Textron Systems," said Textron Chairman, President and CEO Lewis B. Campbell.

50.     On July 17, 2008, the Company filed a Form 8-K with the SEC.  The July 17, 2008

Form 8-K contained as an exhibit a press release  the Company issued on July 17, 2008 entitled

"Textron Reports Second Quarter EPS from Continuing Operations of $1.03; Record $23.5 Billion

Aircraft and Defense Backlog; Manufacturing Businesses Post 16% Organic Growth."  The press

release stated in pertinent part as follows:

Textron Inc. (NYSE: TXT) today reported solid second quarter results with a 21 percent increase in earnings per share from continuing operations on a revenue increase of 21 percent. Year-to-date cash flow provided by operating activities of continuing operations was $413 million, resulting in free cash flow of $220 million.

"We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong and led to another record level of backlog," said Textron Chairman, President and CEO Lewis B. Campbell. "Likewise, we had double-digit organic growth at E-Z-GO, where our new golf car has been well received, and Fluid & Power where our energy-related products are in high demand," Campbell added.

Second quarter 2008 income from continuing operations was $1.03 per share, compared to $0.85 in the second quarter of 2007. Including discontinued operations, second quarter 2008 net income was $1.02 per share compared to $0.83 a year ago. Second quarter 2008 revenue was $3.9 billion, compared to $3.2 billion last year.

23

Reflecting continued strong demand in aircraft and defense, combined backlog at Cessna, Bell Helicopter and Textron Systems increased to $23.5 billion at the end of the quarter, up from $18.8 billion at the end of last year.

2008 Outlook

Textron continues to expect 2008 earnings per share from continuing operations to be between $3.80 and $4.00 per share. The company is initiating its third quarter earnings forecast at $0.80 to $0.90 per share. The company continues to expect free cash flow for the year will be in the range of $700 to $750 million.

Segment Results

Cessna

Cessna's second quarter revenues increased $298 million over last year's same period, reflecting delivery of 117 business jets compared to 95 in 2007, improved pricing and a benefit from the Columbia Aircraft Manufacturing Corporation acquisition.

Segment profit increased $62 million due to the impact from higher volume, improved pricing, partially offset by inflation, and increased engineering and product development expense.

Cessna backlog at the end of the second quarter was $16.0 billion, up $3.4 billion from the end of last year, reflecting 437 Citation jet orders in the first half.

\* \* \*

Finance segment revenues decreased $62 million primarily due to lower market interest rates and a decrease in fee income, which reflected last year's $21 million gain from the sale of a leveraged lease, offset by $5 million in higher securitization gains this year. Revenues were also reduced to reflect the estimated impact on the company's leveraged lease portfolio related to a court decision involving other companies addressing the tax treatment of Sale-In, Lease-Out (SILO) transactions.

Profit in the Finance segment decreased $55 million due to an increased provision for loan losses, the decrease in fee income, which reflected last year's $21 million gain, the impact of higher borrowing costs relative to various market rate indices and the SILO adjustment. These reductions in profit were partially offset by a benefit from increased receivable yields on loans with interest rate floors and a

reduction in selling and administrative expenses. The increase in the provision for loan losses was primarily driven by a reserve established for one account in the golf finance portfolio and increased loan loss provisions in the distribution finance portfolio.

The sixty-day plus delinquency percentage increased to 0.61 percent of finance receivables from 0.33 percent at the end of the first quarter. Nonperforming assets (NPA) increased to 2.31 percent of total finance assets from 1.84 percent at the end of the first quarter.

51.     The truth began to emerge leading up to the filing of the Company's Form 8-K October 16, 2008 which contained as an exhibit a press release the Company issued on October 16, 2008 entitled "Textron Reports Third Quarter EPS from Continuing Operations of $0.85; Strategic Actions Announced, Led by TFC Downsizing Maintains Record Aircraft & Defense Backlog." Before the press release, on or about September 16, 2008, analysts at thestreet.com downgraded Company stock noting "weaknesses including poor profit margins, a generally disappointing performance in the stock itself and generally poor debt management." Additionally, the stock fell heavily after a *Reuters* report on September 26, 2009 noted that the consensus earnings for Textron were $0.89, down six cents from the third quarter of the previous year. On September 29, 2008 (the trading day after the Reuters consensus earnings were reported, the Textron closed at $27.5 per share, down 16.5% from its open of $32.95 per share on September 26, 2009.

52.     The Press Release attached to the Company's October 16, 2008 Form 8-K confirmed thestreet.com's downgrade, and stated in pertinent part as follows:

Textron Inc. (NYSE: TXT) today reported third quarter 2008 income from continuing operations of $210 million or $0.85 per share, compared to third quarter 2007 income from continuing operations of $225 million or $0.88 per share. Last year's result included a one-time gain related to an insurance settlement, worth about $0.05 per share.

* * *

25

"Strength in our aircraft and defense businesses offset weaker than expected performance in the finance business arising from the challenging economic environment," said Textron Chairman, President and CEO Lewis B. Campbell. "We remain committed to achieving strong performance results at our aircraft and defense businesses as we work through the issues facing us in our other segments," Campbell added.

Combined backlog at Cessna, Bell and Defense & Intelligence remained at a record $23.5 billion at the end of the quarter.

* * *

Strategic Actions

Campbell announced, "Given the sustained turmoil in world credit markets we are taking a number of strong and measured steps, including:

   o   a downsizing of Textron Financial Corporation (TFC),

   o   a strengthening of our already strong capital and liquidity positions,

   o   and an accelerated cost reduction program across the company."

The first action is to reduce the size of TFC, Textron's commercial finance business. The company will be exiting its Asset Based Lending and Structured Capital segments, and several additional product lines through an orderly liquidation as market conditions allow. TFC will also limit new originations in its Distribution Finance, Golf, and Resort portfolios, consistent with maintaining franchise value and our commitment to service existing credit-worthy customers.

As a result of the decision to downsize TFC, Textron expects to take a non-cash impairment charge in the fourth quarter of up to $169 million, which represents the current goodwill balance at TFC. The company will also incur restructuring charges for headcount reductions and consolidations.

Textron will make capital contributions to TFC, as appropriate, to strengthen TFC's capital structure and to maintain certain minimum requirements under TFC's committed credit facilities and Textron's support agreement with TFC.

"Going forward, we will continue to carefully evaluate the appropriate range of remaining lending activities at TFC in light of strategic fit and continuing developments in the capital markets, all in a manner that maximizes value for shareholders in any current or future financial market scenarios," Campbell noted.

In order to maximize funding predictability in the current environment, Textron has suspended its share repurchase program and is exploring a number of options to reduce a portion of its outstanding commercial paper funding.

Finally, Textron is initiating an accelerated overhead cost reduction and productivity improvement program across the enterprise. Including restructuring costs at TFC, the company expects total restructuring charges of about $25 million, with most of the charges occurring in the fourth quarter. Annualized benefits associated with the charges are estimated to be $40 million.

Segment Results

Cessna

Cessna's third quarter revenues and segment profit increased $150 million and $16 million, respectively, compared with the third quarter of 2007. Revenues increased due to higher volume and pricing, along with the benefit from an acquisition. The increase in volume reflects higher jet and Caravan deliveries, partially offset by lower used aircraft sales. Cessna delivered 124 jets in the quarter, compared with 103 jets last year.

Segment profit increased due to higher volumes and pricing in excess of inflation, partially offset by higher engineering and product development expense and higher overhead costs.

Cessna backlog at the end of the third quarter was $15.6 billion, up $3 billion from the end of last year, reflecting 484 jet orders taken year-to-date, with 47 jet orders in the quarter.

\* \* \*

Finance

Finance revenues decreased $30 million in the third quarter, due to lower market interest rates partially offset by the benefits of higher volume and interest rate floors. Segment profit decreased $36 million due to an increase in the provision for loan losses and higher borrowing costs, partially offset by the benefit of interest rate floors.

27

Borrowing costs increased relative to the target Federal Funds rate as credit market volatility continued during the quarter. The increased borrowing costs were driven by a widening in the spread between LIBOR and the target Federal Funds rate and, to a lesser extent, from increased borrowing spreads on debt in comparison with 2007. These increases were substantially offset by increased receivable pricing as a result of variable-rate receivables with interest rate floors.

Sixty-day plus delinquencies increased to 1.06 percent of finance receivables from 0.61 percent at the end of the second quarter. Nonperforming assets increased to 2.67 percent of total finance assets from the second quarter level of 2.31 percent.

2008 Outlook

Excluding goodwill impairment and restructuring charges, Textron expects fourth quarter 2008 earnings per share from continuing operations will be between $0.80 and $0.90 per share. GAAP earnings per share from continuing operations are expected to be between $0.04 and $0.14 per share. The company continues to expect free cash flow for the year will be in the range of $700 to $750 million.`

Campbell concluded, "The economic environment will continue to be uncertain over at least the next several quarters. However, we believe the actions we are taking, combined with our government programs and aircraft backlog, position us to perform well through these difficult times."

53.     Also on October 16, 2008, a news release issued by Brian Foley Associates, an industry expert in business aviation consulting, issued a press release entitled "Latest Industry Delivery Forecasts Unrealistic Predictions Unveiled at NBAA Too Optimistic" warning, among other things, that:

recent delivery forecasts *outdated the day they were published*, Brian Foley Associates (BRiFO) asserts that the future will not be as rosy as others predict. *"If they haven't already, new aircraft orders are poised to fall off a cliff.* Who in their right mind would part with tens of millions of dollars in this economic environment to buy an aircraft?" warns BRiFO consultancy President Brian Foley.

"The record order books will not be as firm as OEMs would like to

> think, and we're warning our clients to expect double-digit
> percentage order cancellations depending on the manufacturer.
> Those OEMs with an exposure to start-up charter, air taxi and
> fractional programs are most at risk, as are those who always
> seemed to have near-term delivery positions available while the
> rest of the industry had multi-year waits." [emphasis added].

54.     In response, analysts downgraded Textron, which fell 17% to $15.52 per share.

55.     On December 22, 2008, the Company announced a plan to exit all of Textron

Financial Corporation's commercial finance business through a combination of orderly liquidation

and selected sales, other than that portion of the business supporting the financing of customer

purchases of Textron-manufactured products.

56.     The Company's stock plunged twenty percent following the announcement. Based on

that news, Textron stock the next day, December 23, 2008 plunged $3.14, or 20 percent, to $12.20 at

4:01 p.m. in New York Stock Exchange composite trading. It was the largest once day percentage

loss for Textron stock since Sept. 26, 2001.

57.     Summarizing the problems that Defendants knew or should have known of

throughout the Class Period, and which would soon be revealed to the Plan's participants, in a

January 21, 2009 article entitled "Corporate News: Business-Jet Demand Is Stalling --- After a Five-

Year Climb, Orders Slow Sharply and Cancellations Are Up" *The Wall Street Journal* reported that:

> Demand for multimillion-dollar business jets is arcing back to earth
> after a five-year climb, bringing an end to the industry's biggest
> boom.
>
> Corporate jets are getting less use as global business activity drops off
> and companies cut back perks like private jet travel. Orders have
> slowed sharply and cancellations are increasing as the buyers that
> fueled the ascent in Asia, the Middle East, the U.S. and Europe come
> under pressure.
>
> The biggest hit could come from a shakeout among fleet buyers, the
> fledgling charter operators, air-taxi services and fractional-ownership
> providers -- many of them startups -- that sprang up when the world

economy was humming along. A drop in orders or rise in cancellations could hurt manufacturers like Canada's Bombardier Inc., Brazil's Embraer S.A and Textron Inc.'s Cessna.

"The market is going down so fast that we're all getting bloody noses," said Brian Foley, a New Jersey-based consultant. He expects cancellations to reach double-digit levels in 2009, followed by a very slow recovery.

Cessna, the biggest business-jet maker in terms of numbers, announced last week that it would lay off 2,000 workers -- in addition to the 500 jobs it cut in December -- to "ensure our long-term stability and success" as customers defer orders.

Analysts expect more details from aircraft makers and their suppliers, which will report fourth-quarter earnings in coming weeks. Textron reports earnings Jan. 29, with Honeywell International Inc. following on Jan. 30 and fellow supplier Rockwell Collins Inc. on Feb. 3. Hawker Beechcraft, which is jointly owned by Toronto-based Onex Corp. and Goldman Sachs Group, is expected to report next month.

Fleet orders have grown from an occasional presence in manufacturers' order books to a key presence, with many coming from companies that have yet to prove their staying power, Mr. Foley said.

"Where previous order books were speckled with fleet orders from a handful of fractional providers, current order books sport a cadre of unproven, startup-fleet purchasers launching amid a world-wide recession," he said.

\* \* \*

"These times may one day be remembered in our industry as the 'jet' bust, analogous to the 'dot-com' bust of yesteryear," Mr. Foley said in a recent report.

58.     On January 29, 2009 the Company issued a press release entitled "Textron Reports Fourth Quarter and Full-Year Financial Results." The press release stated in pertinent part as follows:

Textron Inc. (NYSE: TXT) today reported fourth quarter 2008 income from continuing operations, excluding special charges, of $0.40 per share, consistent with its December 22, 2008 press release.

Revenues in the quarter were $3.6 billion, up slightly compared to the fourth quarter of 2007.

On a GAAP basis, Textron reported a loss from continuing operations for the quarter of $348 million or $1.44 per share, as compared to fourth quarter 2007 income from continuing operations of $247 million or $0.97 per share. Including discontinued operations, Textron's fourth quarter 2008 net loss was $209 million or $0.87 per share, compared with fourth quarter 2007 net income of $256 million or $1.00 per share.

On December 22, 2008, the company announced a plan to exit all non-captive financial business. As a consequence, in the quarter, Textron recorded a number of special charges including a $293 million pre-tax mark-to-market adjustment against finance receivables held for sale, a $169 million pre-tax impairment charge to eliminate Textron Financial Corporation's (TFC) goodwill and a $31 million tax charge related to the change in investment status of TFC's Canadian subsidiary. Textron also recorded a pre-tax restructuring charge of $64 million related to cost-saving initiatives across the enterprise.

For the full year, Textron's Manufacturing group generated net cash from operating activities before capital contributions to and net dividends from TFC of $899 million and incurred capital expenditures of $542 million.

TFC paid Textron net dividends of $142 million during the year. During the fourth quarter Textron made a $625 million capital contribution into TFC to maintain the earnings to fixed charge coverage ratio under the support agreement between Textron and TFC. Cash flow from operations for the Manufacturing group under a GAAP basis totaled $416 million as compare to $1.2 billion for 2007.

"Economic conditions continued to weaken during the fourth quarter, significantly impacting our Industrial and TFC businesses," said Textron Chairman and CEO Lewis B. Campbell. "However, for the year, we had strong performance at Bell, Cessna and Textron Systems," Campbell added.

\* \* \*

Outlook

Looking to 2009, the company expects the economy will continue to impact results at TFC and result in lower volumes at Cessna and

Industrial. On this basis, the company estimates 2009 revenues will be approximately $12.5 billion, free cash flow from continuing operations of the manufacturing group will be about $450 million and earnings per share from continuing operations will be in the range of $1.00 to $1.50, excluding expected pre-tax restructuring charges of about $40 million.

\* \* \*

Segment Results

Cessna

Cessna's fourth quarter revenues and segment profit decreased $64 million and $90 million, respectively, compared with the fourth quarter of 2007. Revenues decreased in spite of the sale of more jet units, primarily reflecting a higher proportion of Mustang sales. This decrease was partially offset by higher pricing and the benefit from the acquisition of the Columbia single engine product lines.

Segment profit decreased due to used aircraft valuation adjustments, the impact from lower revenue mix, higher product development expense and overhead costs.

Cessna backlog at the end of the fourth quarter was $14.5 billion, up $1.9 billion from the end of last year.

\* \* \*

Finance revenues decreased $64 million in the fourth quarter due to lower market interest rates, and lower securitization gains which were partially offset by the benefit of interest rate floors.

Segment profit decreased $171 million as a result of increased loan loss provisions, higher borrowing costs and lower securitization gains, partially offset by the benefit of interest rate floors.

Increased loan loss provisions reflected weakening general market conditions, declining collateral values and the lack of liquidity available to our borrowers and their customers. These provisions also incorporated estimates for an increase in expected credit losses resulting from TFC's exit plan.

Sixty-day plus delinquencies increased to 2.59% from 1.06% at the end of the third quarter. Nonperforming assets increased to 4.72% compared to 2.67% in the third quarter.

32

> Managed receivables ended the year at $10.8 billion, versus $11.4
> billion at the end of the third quarter.

59.     In response to the news, Textron common stock fell 32% to $9.09 per share.

60.     At various times during the Class Period, the artificial inflation was released from Textron stock, which opened Class Period trading on December 31, 2006 at $46.89 per share (split adjusted, and the last trading day before the Class Period was December 29, 2006) and closed on January 29, 2009 at $9.09 per share, down $37.8 per share, or almost 81%.

61.     Post Class Period revelations confirm the imprudence of the Textron Stock Fund for the Plan.

62.     On February 5, 2009, analysts at J.P. Morgan cut their rating on Textron to neutral from overweight, citing liquidity concerns at the company's financial arm and a difficult environment for divestitures. The broker said that the overweight rating on Textron is "tough to support with current fundamentals, persistent concerns around liquidity and management's subpar track record on execution."

63.     On February 9, 2009, the Company announced that its chief financial officer Ted French would step down immediately, Buell "Jay" Carter, and the head of subsidiary Textron Financial Corp., was retiring. *The Wall Street Journal* noted that the "sudden departures [] follow major fourth-quarter losses by the financial unit and the threat of a downgrade of the helicopter and private-jet maker's credit rating."

64.     On April 28, 2009 the Company issued a press release entitled "Textron Reports First Quarter Earnings of $0.35 per Share; Ends Quarter with $1.7 Billion in Cash; Reduction of Finance Portfolio Ahead of Plan." The press release recognized that there were 92 net Cessna cancellations during the first quarter of 2009 and the Company's finance segment profit was down $108 million as

a result of increased loan loss provisions, lower securitization gains and lower other income, in part related to the company's liquidation plan, partially offset by the benefit of interest rate floors.

65.     Summing up years of problems at the Company, on July 21, 2009, *Reuters* reported that Textron's credit ratings are teetering on the edge of junk territory, risk being downgraded if the company falls behind in executing its financial plan, and that Fitch Ratings cut its ratings on Textron and its financial arm into junk territory in April of 2009, that Moody's Investors Service the same month cut Textron and Textron Financial to Baa3, the lowest investment grade, and gave the company a negative outlook, indicating a downgrade into junk may be likely in the next 12 to 18 months. The article further reported that:

> Textron Inc's debt values and credit ratings risk coming under pressure if the diversified manufacturer falls behind schedule in shoring up liquidity and shrinking its lending arm.
>
> Providence, Rhode-Island-based Textron is seeking to unwind its noncaptive financial business as it grapples with higher loan losses at the same time as the world's largest maker of business jets' earnings have been hurt by a sharp falloff in demand.
>
> The company has slashed its dividend, raised new capital and committed to a timeline to improving its liquidity, though concerns that the company may fall behind schedule have weighed as it also faces $2.3 billion in maturing debt in 2010, most of which is at its financial arm, Textron Financial Corp.

## MISMANAGEMENT OF PLAN ASSETS

66.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

34

67.     Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. § 1104(c), because the Participants did not exercise independent control over their accounts, because Defendants subjected them to improper influence with respect to the Plan's investments in Textron common stock, and because Defendants concealed material non-public information concerning Textron that they were not precluded from disclosing under applicable law.

68.     Defendants breached their fiduciary duties in that they should have known the facts alleged above and should have known that the Plan should not have invested in Textron common stock during the Class Period.

## FIRST CLAIM:  IMPRUDENT INVESTMENT IN TEXTRON COMMON STOCK (AGAINST ALL DEFENDANTS)

69.     Plaintiff realleges and incorporates herein by reference the allegations set forth above.

70.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

71.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.  Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.  By their continuing to offer Textron common stock as an investment under the Plan, when Textron's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

72.     In particular, Textron was an imprudent retirement investment for the Plan during the

Class Period because of, inter alia, the facts that:

> (a)      The Company's Class Period forecasts contained in the SPD or in documents incorporated by reference in the SPDs were unreasonably over-optimistic in light of market conditions;

> (b)      The Company's "record backlogs" contained in the SPD or in documents incorporated by reference in the SPDs of Cessna orders were not as firm as Defendants' led Participants to believe which undermined the reasonableness of the forecasts referenced above;

> (c)      The Company did not timely write down assets due to generally poor debt management ensured that the assets of its finance segment were materially overstated;

> (d)      The Company's credit ratings would necessarily suffer as a result of material overstatements in the Company's finance segment when the deterioration began to be reported to the investing public;

> (e)      as a result of the above and other facts, the Company's projections were skewed and its ability to generate future revenue were severely jeopardized;

> (f)      the Company lacked the required internal controls, and, as a result, the Company's projections were based upon defective assumptions; and,

> (g)      as a result of the above, the Company's stock was both artificially inflated and an imprudent retirement investment.

73.      As a consequence of Defendants' breaches, the Plan performed worse than a portolio of the same size would have if it had been invested in prudent investments.

74.      Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

75.      Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award

appropriate equitable relief, including in the form of restitution.

## SECOND CLAIM:  MATERIAL MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

76.      Plaintiff realleges and incorporates herein by reference the allegations set forth above.

77.      Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

78.      Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

79.      Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

80.      In particular, the Plan's fiduciary communications (such as SPDs) and SEC filings during the Class Period, including its proxy statements and SEC filings on Forms 10-Q 10-K and 8-K, which were incorporated into the SPDs, were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information, including, *inter alia*, the facts that:

(a)      The Company's Class Period forecasts were unreasonably over-optimistic in light of market conditions;

(b)      The Company's poor profit margins artificially inflated its stock prices;

(c)      The Company's generally poor debt management ensured that the assets of its finance segment were materially overstated;

(d)     The Company's credit ratings would necessarily suffer as a result of material overstatements in the Company's finance segment;

(e)     as a result of the above, the Company's projections were skewed and its ability to generate future revenue were severely jeopardized;

(f)     the Company lacked the require internal controls, and, as a result, the Company's projections were based upon defective assumptions and/or manipulated facts;

(g)     the Company lacked the necessary personnel to issue accurate financial reports and projections; and,

(h)     as a result of the above the Company's stock was both artificially inflated and an imprudent retirement investment.

81.     The Participants relied upon, and are presumed to have relied upon, Defendants' material misrepresentations to their detriment.

82.     As a consequence of Defendants' material misrepresentations, the Plan suffered losses and damages were suffered by the Plan because its performance was inferior to how it performed if it was invested in prudent investments

83.     Defendants are individually liable to make good to the Plan any losses to or damages suffered by the Plan resulting from each breach.

84.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## THIRD CLAIM: NONDISCLOSURE/OMISSION OF MATERIAL FACTS
## (AGAINST ALL DEFENDANTS)

85.     Plaintiff realleges and incorporates herein by reference the allegations set forth above except paragraphs 76-84.

86.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

87.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

88.    Defendants breached these fiduciaries in that they made nondisclosures as alleged above.

89.    In particular, each and every fiduciary communication (including but not limited to SPDs, newsletters, account statements) during the Class Period omitted material, relevant data and other facts which were necessary for Plan participants to understand the true risk/return characteristics of an investment Company stock, including, *inter alia*, the facts that:

90.    In particular, Textron was an imprudent retirement investment for the Plan during the Class Period because of, inter alia, the facts that:

(a)    The Company's Class Period forecasts were unreasonably over-optimistic in light of market conditions;

(b)    The Company's poor profit margins artificially inflated its stock prices;

(c)    The Company's generally poor debt management ensured that the assets of its finance segment were materially overstated;

(d)    The Company's credit ratings would necessarily suffer as a result of material overstatements in the Company's finance segment;

(e)    as a result of the above, the Company's projections were skewed and its ability

39

to generate future revenue were severely jeopardized;

(f)     the Company lacked the require internal controls, and, as a result, the Company's projections were based upon defective assumptions and/or manipulated facts;

(g)     the Company lacked the necessary personnel to issue accurate financial reports and projections; and,

(h)     as a result of the above the Company's stock was both artificially inflated and an imprudent retirement investment. The Company's Class Period forecasts were unreasonably over-optimistic in light of market conditions;

91.     The Participants relied upon, and are presumed to have relied upon, Defendants' omissions to their detriment.

92.     As a consequence of Defendants' omissions the Plan suffered losses and damages were suffered by the Plan because its performance was inferior to how it performed if it was invested in prudent investments.

93.     Defendants are individually liable to make good to the Plan any losses to or damages suffered by the Plan resulting from each breach.

94.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## FOURTH CLAIM: DIVIDED LOYALTY
## (AGAINST THE INDIVIDUAL DEFENDANTS ONLY)

95.     Plaintiff realleges and incorporates herein by reference the allegations set forth above.

96.     Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plan any losses to the Plan resulting from each breach and shall be subject to such other

equitable and remedial relief as the court may deem appropriate.

97.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

98.     Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

99.     As a consequence of these breaches, the Plan suffered losses and damages were suffered by the Plan because its performance was inferior to how it performed if it was invested in prudent investments.

100.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

101.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.      Actual damages in the amount measured by the difference between the performance of Textron common stock in the plan during the Class Period compared to the performance of a prudent investment that the Plan could have invested in during the Class Period, with such damages to be allocated among the Participants' individual accounts in proportion to the accounts' damages incurred by those accounts;

B.      Appropriate equitable relief, including in the form of restitution;

C.      Costs pursuant to 29 U.S.C. § 1132(g);

D.      Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine as

well as reimbursement of costs and expenses incurred in litigating this action including expert

expenses; and,

E.      Such other relief as the Court may deem equitable and just.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues to triable.

Dated: August 21, 2009                              Respectfully submitted,

                                                    **LAW OFFICES OF STEPHEN R. WHITE**

                                                    By: _____
                                                        Stephen R. White (R.I. Bar #2372)
                                                        200 Centerville Road, Suite One
                                                        Warwick, Rhode Island 02886
                                                        Tel: (401) 732-3939
                                                        Fax: (401) 732-0028
                                                        Email: steve@srwesq.com

                                                        Edwin J. Mills
                                                        Mark Levine
                                                        Michael J. Klein
                                                        **STULL, STULL & BRODY**
                                                        6 East 45th Street
                                                        New York, New York 10017
                                                        Telephone: (212) 687-7230
                                                        Fax: (212) 490-2022
                                                        Email: emills@ssbny.com
                                                               mlevine@ssbny.com
                                                               mklein@ssbny.com

                                                        *Attorneys for Plaintiff*