_____x
:
IN RE TEXTRON, INC. ERISA LITIGATION   :    Civ. Action No.: 09-383-ML
:    (Consolidated Actions)
:
_____:    CLASS ACTION
:
This Document Pertains to    :
ALL ACTIONS    :
_____x

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Diana Leach, Holly G. Sheets, Susan Felton, Alma I. Perez, Marion L. Tompkins, Adrienne R. Harrington, Robert T. Arthur, Jubrina Hook, and Alice Sage ("Plaintiffs"), individually, as representatives of the Textron Savings Plan (the "Plan"), and, to the extent deemed necessary, on behalf of a class of similarly situated Participants in and beneficiaries of the Plan (collectively, the "Participants"), by their attorneys, allege the following for their Complaint (the "Complaint"):

## NATURE OF THE ACTION

1.    Plaintiffs bring this action individually, as representatives of the Plan and, to the extent deemed necessary by the Court, on behalf of a class of all Participants in the Plan for whose individual accounts the Plan invested in units of the Textron Stock Fund (the "Fund," the "Textron Stock Fund" or the "Company Stock Fund") from July 17, 2007 to the present (the "Class Period"). Plaintiffs bring this action on behalf of both the Plan and the Participants pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2) and (3). Plaintiffs name as defendants Textron,

Inc. ("Textron" or the "Company"), the Textron Investment Committee (the "Committee"), and the members of that Committee (the "Members"). Textron, the Committee and the Members are collectively referred to herein as the "Defendants".

2.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and U.S. Department of Labor regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty. Plaintiffs also seek equitable relief.

3.     Defendants allowed the investment of the Plan's assets in Textron common stock ("Textron Stock" or "Company Stock") through the Fund throughout the Class Period, even though they knew or should have known that the Company's serious mismanagement, improper business practices, and dire financial circumstances made the Company Stock, and therefore the Fund, an imprudent investment alternative for the Plan. For example, Defendants knew or should have known, among other things, that Textron: (a) was reporting a large "backlog" of airplane orders for its Cessna segment that were illusory; (b) was engaged in numerous potential fraud and ethics violations concerning mischarging for labor on contracts with the U.S. Department of Defense in its Bell Helicopter segment; (c) was experiencing a deterioration of the Company's credit portfolio as a result of defaults, late payments and decreased credit-worthiness of borrowers; (d) was reporting artificially inflated financial results and its financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (e) was engaging in high-risk lending; and (f) had overstated its capital strength, all of which created dire financial circumstances. Textron's

2

deteriorating financial condition made the Plan's continued investment in the Fund an excessively risky investment for retirement assets which was evidenced, in part, by numerous downgrades of Textron's credit and liquidity ratings and an exorbitantly high debt-default and bankruptcy risk, including an Altman Z-score – a financial formula commonly used by financial professionals to predict whether a company is likely to go bankrupt – which forecast that Textron was on the verge of bankruptcy.

4.     Plaintiffs allege that it was imprudent to permit the Plan to invest in the Fund and the Fund to invest in Textron Stock and maintain the Plan's pre-existing heavy investment in Company Stock because the Company's dire financial circumstances rendered it an imprudent investment option and because the price of Company Stock was artificially inflated.  Plaintiffs also allege that Defendants breached their fiduciary duties by negligently failing to disclose material information regarding the Company's financial condition and the prudence of investing in Company Stock, which prevented Participants from making informed decisions concerning the Plan's assets, benefits and investments in the Fund.

<u>**JURISDICTION AND VENUE**</u>

5.     ***Subject Matter Jurisdiction***.  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States."  28 U.S.C. § 1331.

6. ***Personal Jurisdiction***. ERISA provides for nation wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

7. ***Venue***. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and/or some Defendants reside or maintain their primary place of business in this District.

## CLASS ACTION ALLEGATIONS

8. ***Class Definition***. Plaintiffs bring this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between July 17, 2007 and the present, and whose accounts included investments in the Textron Stock Fund. Excluded from the Class are Defendants herein, officers and directors of Textron, members of Defendants' immediate families, and the heirs, successors or assigns of the foregoing.

9. ***Numerosity.*** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least 41,617 members of the Class who participated in, or were beneficiaries of,

the Plan during the Class Period (based on the Plan's Form 5500 Annual Return filed with the Internal Revenue Service ("IRS"), dated October 16, 2008).

10. ***Commonality.***  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a) whether Defendants each owed a fiduciary duty to Plaintiffs and the other members  of the Class;

> (b) whether Defendants breached their fiduciary duties to Plaintiffs and the other members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

> (c) whether Defendants violated ERISA; and

> (d) whether the Plan suffered compensable losses and, if so, what is the proper measure of damages.

11. ***Typicality.***  Plaintiffs' claims are typical of the claims of the other members of the Class because:  (a) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan are not only typical of, but identical to claims under this section brought by any other Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all other Class members equally.

12. ***Adequacy.***  Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the other members of the Class.

13.    ***Rule 23(b)(1)(B) Requirements.***  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

14.    ***Other Rule 23(b) Requirements.***  Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

15.    In the alternative, if the Court determines that class certification is not necessary and/or not appropriate, Plaintiffs request that the Court recognize Plaintiffs' legal right to obtain complete recovery for the entire Plan for the fiduciary violations alleged in this Complaint pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2) states that "[a] civil action may be brought . . . by a participant . . . for appropriate relief under section 1109 of this title. . . ."  ERISA Section 409(a), 29 U.S.C. § 1109(a), states:

> Any person who is a fiduciary with respect to a plan who breaches any
> of the responsibilities, obligations, or duties imposed upon fiduciaries
> by this subchapter shall be personally liable ***to make good to such***

*plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added).

## THE PARTIES

### Plaintiffs

16.     ***Plaintiff Diana Leach*** ("Leach") is a resident of the State of Texas.  During the Class Period Plaintiff Leach was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Leach's individual Plan account.

17.     ***Plaintiff Holly G. Sheets*** ("Sheets") is a resident of the State of Georgia.  During the Class Period Plaintiff Sheets was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Sheets' individual Plan account.

18.     ***Plaintiff Susan Felton*** ("Felton") is a resident of the State of Texas.  During the Class Period Plaintiff Felton was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Felton's individual Plan account.

19.     ***Plaintiff Alma Perez*** ("Perez") is a resident of the State of California.  During the Class Period Plaintiff Perez was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Perez' individual Plan account.

20.     **_Plaintiff Marion L. Tomkins_** ("Tomkins") is a resident of the State of Kansas. During the Class Period Plaintiff Tomkins was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).   During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Tomkins' individual Plan account.

21.     **_Plaintiff Adrienne R. Harrington_** ("Harrington") is a resident of the State of South Carolina.  During the Class Period Plaintiff Harrington was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Harrington's individual Plan account.

22.     **_Plaintiff Robert T. Arthur_** ("Arthur") is a resident of the State of North Carolina.  During the Class Period Plaintiff Arthur was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Arthur's individual Plan account.

23.     **_Plaintiff Jubrina Hook_** ("Hook") is a resident of the State of South Carolina. During the Class Period Plaintiff Hook was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).   During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Hook's individual Plan account.

24.     **_Plaintiff Alice Sage_** ("Sage") is a resident of the State of Kansas.  During the Class Period Plaintiff Sage was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, the Plan purchased and/or maintained units of the Fund for Plaintiff Sage's individual Plan account.

**Defendants**

25.     **Defendant Textron** is a manufacturer of aircraft and industrial products with offices at 40 Westminster Street, Providence, Rhode Island.  Textron is the Administrator of the Plan, as set forth in the 1999 Amended and Restated Plan Document ("1999 Plan Document"), § 17.01, and the 2009 Amended and Restated Plan Document ("2009 Plan Document"), § 17.01.

26.     **Defendant Textron Investment Committee** ("Investment Committee") is, on information and belief, an unincorporated association of Textron employees to whom Textron, as Plan Administrator, delegated authority (pursuant to § 17.01 of the 1999 and 2009 Plan Documents) to make investment decisions for the Plan.

27.     **Defendant Ted R. French** ("French"), was during the Class Period, until on or around February 9, 2009, the Chief Financial Officer of the Company.  During the Class Period up until on or around February 9, 2009, French was also a member of the Investment Committee.  During the Class Period, French sold over 72,000 shares of Textron common stock and received proceeds from those sales of over $4.5 million.

28.     **Defendant Richard L. Yates** ("Yates"), was during the Class Period, a Senior Vice President and Controller.   Yates was appointed Textron's acting Chief Financial Officer on or around February 9, 2009.  During the Class Period, Yates was also a member of the Investment Committee.  During the Class Period Yates sold over 45,000 shares of Textron common stock and received proceeds from those sales of over $2.75 million.

29.     **Defendant Cathy A. Strecker,** was during the Class Period, Vice President of Human Resources and Benefits of Textron since October, 3, 2007 and has been employed by

Textron throughout the Class Period. During the Class Period, Strecker was also a member of the Investment Committee.

30.     **Defendant Deborah A. Imondi** ("Imondi"), was during the Class Period, Assistant Treasurer, Investment Management of Textron. During the Class Period, Imondi was also a member of the Investment Committee.

31.     **Defendant Mary F. Lovejoy** ("Lovejoy") was during the Class Period, vice president and treasurer of Textron. According to the Textron web site, she is responsible for overseeing Textron's investment of pension fund assets. During the Class Period, Lovejoy was also a member of the Investment Committee.

32.     The Committee Members are and/or were all senior officers and employees of Textron who served on the Committee in the ordinary course of their employment and for no additional compensation, and who exercised authority or control over the Plan, Plan assets and/or the Fund. As a result of their employment as senior officer and employees of the Company, the Committee Members knew or should have known all of the facts alleged herein.

## DESCRIPTION OF THE PLAN

33.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

34.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual

accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

35.     The Plan is a voluntary contribution plan whereby Participants elect to contribute a portion of their compensation to the Plan as follows ("Participant Contributions"):

> Participants of the Plan are entitled to elect compensation deferrals up to 40% of their eligible compensation, within the limits prescribed by Section 401(k) of the Internal Revenue Code (the Code). Participants may also contribute amounts representing distributions from other qualified employer retirement plans. Participants' pre-tax and after-tax contributions, which are matched up to 50% up to 5% of eligible compensation by Textron subject to certain ERISA restrictions and plan limits, are recorded when Textron makes payroll deductions from participants' wages.

*See* Textron Inc. Form 11-K, filed with the SEC on June 29, 2009 ("2008 Form 11-K"), at 4.

36.     Participant Contributions were held in trust and invested in Investment Funds chosen and monitored by Plan fiduciaries as follows:

> Participants may elect to direct their employee contributions to the following funds: The Textron Stock Fund, PIMCO Total Return Fund, Vanguard High-Yield Corporate Fund, Vanguard Institutional Index Fund, Vanguard Institutional Developed Markets Index Fund, Vanguard Strategic Equity Fund, Fidelity Equity Income Fund, Fidelity Blue-Chip Growth Fund, Fidelity Small Cap Stock Fund, Fidelity Diversified International Fund, a number of Fidelity Freedom

Funds (with various targeted retirement dates) and the Textron Stable
Value Fund.

*See id.*

37.    The Company made contributions to the Plan on behalf of its employee
Participants. These Company contributions matched a portion of the Participant
Contributions as follows ("Employer Contributions"):

> Certain participants in the Plan are entitled to receive a retirement
> supplement contribution which is equal to 1% of the participant's
> eligible compensation. Participants eligible for a retirement
> supplement contribution are also eligible for a matching contribution.
> Contributions from employees who receive a retirement supplement
> are matched 100% up to 4% of eligible salary by Textron subject to
> certain ERISA restrictions and plan limits, and are recorded when
> Textron makes payroll deductions from participants' wages.

*See id.,* at 5.

38.    Employer contributions vested based on the length of a participant's service in
the Plan as follows: 24 months but less than 36 months = 25%; 36 months but less than 48
months = 50%; 48 months but less than 60 months = 75%; 60 months or more = 100%. *See
id.,* at 6.

39.    Employer Contributions were held in trust and invested by Plan fiduciaries in
the Textron Stock Fund as follows:

> Employer contributions are invested entirely in the Textron Stock
> Fund. Employees have the ability to subsequently reallocate matching
> contributions among any of the investment options offered in the Plan.

*Id.*, at 5.

40.    The Plan has been heavily invested in Textron Stock through the Textron Stock
Fund throughout the Class Period. According to the Company's annual filings with the SEC

on Form 11-K, the Plan's interest in the Textron Stock Fund was worth $1,167,869,000 (24,894,000[1] shares of Textron Stock, constituting 49.4% of Plan assets) on December 31, 2006; $1,611,547,000 (22,599,000 shares of Textron Stock, constituting 54.3% of Plan assets) on December 31, 2007; and $389,220,000 (28,052,000 shares of Textron Stock, constituting 28.2% of Plan assets), on December 31, 2008.

41.     Pursuant to a trust agreement executed between Fidelity Management Trust Company ("Fidelity" or the "Trustee") and the Company dated December 1, 2004 (and amended January 1, 2009), the assets of the Plan were held in trust by Fidelity.  *See* 2008 Form 11-K, at 4.

## DEFENDANTS WERE FIDUCIARIES

42.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

*See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

43.     In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary

---

[1]  The number of shares of Textron Stock have been adjusted to reflect the 2-for-1 split that took place in August 27, 2007.

activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

44.     Pursuant to ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D), a fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result.

**Textron's Fiduciary Status**

45.     Textron is a named fiduciary of the Plan pursuant to ERISA § 402(a), 29 U.S.C. § 1102(A), because Section 17.01 of both the 1999 Plan Document and of the 2009 Plan Document specifically lists Textron as the Plan Administrator.

46.     Textron was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, the Company through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plan and/or exercised authority or control over the management and disposition of the Plan's assets, and is therefore a fiduciary of the Plan.

47.     Textron was a fiduciary concerning the Plan's investment in the Fund and the Fund's investment in Textron Stock in that the December 1, 2004 Textron Inc. Master Trust Agreement (the "Trust Agreement") between the Company and Fidelity specifically provides

that Textron "shall continually monitor the suitability of the Trust acquiring and holding [Textron] Stock, under the fiduciary duty rules of section 404(a)(1) of ERISA . . . ." Trust Agreement, at 10.

48.     Moreover, as Plan Administrator, Textron has discretionary authority to:

(a)     establish rules and procedures for administration of the Plan;

(b)     determine eligibility for benefits;

(c)     construe the terms of the Plan (including any ambiguity);

(d)     decide all questions arising in the administration of the Plan; and

(e)     take any other actions it believes advisable to maintain operation of the Plan.

Textron, *Textron Savings Plan:  Today's Plan, Tomorrow's Vision* (Summary Plan Description, 2004) (the "2004 SPD").

49.     Upon information and belief, Textron employees, including employees employed in treasury, human resources, legal and communication functions, performed the fiduciary activities set out in paragraphs xx-xx above in the ordinary course of employment.

50.     Textron also exercised discretionary authority, pursuant to Section 17.01 of the 1999 and 2009 Plan Documents, with respect to the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility.

51.     Textron was also a fiduciary to the extent that members of the Textron Board of Directors (the "Board") and/or officers or employees of Textron served on the Committee. Upon information and belief, the Committee Members were officers and other employees of

Textron. Based on these facts, Textron had control over the actions of the Committee and its Members and is liable for the Committee's actions.

52. In addition, Textron acted as a fiduciary in connection with the dissemination of Plan communications to Participants. Textron made direct representations to Participants relating specifically to the Plan's investment options, the business and financial condition of the Company, and the merits of investing the Plan's assets in the Fund, including, but not limited to, the dissemination of a summary plan description ("SPD") and the Plan's prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plan's various investment options. Textron exercised discretion over the contents of the communications, SPDs and Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plan.

**The Fiduciary Status of the Textron Investment Committee and Committee Members**

53. The Committee has "sole discretion to determine the number and character of . . . investment funds (including the underlying composition thereof). . . . [and] to close, limit, or eliminate the availability of any of the investment funds . . . ." 2009 Plan Document, § 8.01(a). Accordingly, the Committee and its Members were fiduciaries for the selection and monitoring of Plan investment options and the investment of Plan assets in those options.

**FIDUCIARY DUTIES UNDER ERISA**

54. *The Statutory Requirements.* ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the

exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

55.     29 U.S.C. § 1104(a).  This provision encompasses several fiduciary duties, as follows:

56.     ***The Duty of Loyalty.***  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to participants and their beneficiaries . . . ."  *Id.*  The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

57.     ***The Duty of Prudence.***  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence  – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."  *Id.*

58.     ***The Duty to Inform.***     The duties of loyalty and prudence include the duty to disclose and inform.   These duties entail:   (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.   These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

59.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants.   Defendants were required to furnish an SPD and Prospectus to Participants.   The SPD, the Prospectus and all information contained or incorporated therein constitute a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries.   Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant.   Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits.   The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations.   The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b). Here, on information and belief, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the Prospectus and/or SPD all of Textron's filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act.

60. ***The Duty to Investigate and Monitor Investment Alternatives.*** With respect to a pension plan such as the Plan at issue here, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan including employer securities, to ensure that each investment is a suitable option for the Plan.

61. ***The Duty to Monitor Appointed Fiduciaries***. Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries. In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

> (a) possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

> (b) are knowledgeable about the operations of the Plan the goals of the Plan and the behavior of Plan's participants;

> (c) are provided with adequate financial resources to do their jobs;

> (d) have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

> (e) have access to outside, impartial advisors when needed;

> (f) maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

19

(g) report regularly to the monitoring fiduciaries.

(h) The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

62. ***The Duty Sometimes to Disregard Plan Documents***. A fiduciary may not avoid his or her fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

63. ***Co-Fiduciary Liability***. A fiduciary is liable not only for fiduciary breaches within the sphere of his or her own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), states, in relevant part, that:

(1) In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(2) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(3) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(4) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

64. ***Non-Fiduciary Liability***.    Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## SUBSTANTIVE ALLEGATIONS

### Introduction

65.    Textron manages its operations through five business segments: (i) Cessna Aircraft Company ("Cessna"); (ii) Bell Helicopter Textron Inc. ("Bell Helicopter"); (iii) the Textron Systems Corporation ("Textron Systems"); (iv) an industrial segment; and (v) a finance segment, Textron Financial Corporation ("Textron Financial").  Cessna manufactures piston, turbo and business-jets; sales of business jets drive Cessna's revenues and market-share in competition with such producers as General Dynamics/Gulfstream and Canadian producer Bombardier.  The Bell Helicopter segment manufactures and markets Bell Helicopters for military and commercial applications; Textron Systems develops and sells products to the defense market; the Industrial segment manufactures a number of linked product lines for the leisure/resort/golf industry and the automotive industry; and the finance segment participates in the financial services markets through Textron Financial.

66.    Throughout the Class Period, Defendants knew or should have known that Textron Stock, and thus the Fund, was an imprudent Plan investment because: (a) the record "backlogs" of unfilled orders that Textron publicized at Cessna for future business-jet production were materially inflated in that many were subject to deferral and cancellation and/or were from a growing number of customers that were mere startup and/or financially distressed fleet operators that lacked the financial resources to pay for or take delivery of aircraft during 2008-

2009; (b) undisclosed, serious misconduct and product defects relating to Bell Helicopter's contracts with the U.S. military; (c) Textron Financial had incurred undisclosed material losses in the fair market value of its finance receivables and other financial assets; (d) Textron's credit ratings were deteriorating in light of Textron Financial's losses and the additional debt the Company would incur in connection with its finance segment's distressed asset base; (e) as a consequence of the above, the Company's Stock price would suffer as the truth became known; and (f) objective financial measures demonstrated that the Company was in serious danger of bankruptcy, and thus was not a prudent retirement investment.

67. As a result of this conduct, Defendants could not have acted prudently when they continued to offer the Fund, permit Plan investment in the Fund and invest Fund assets in Textron Stock.

68. As a consequence of the above facts, Defendants knew or should have known that Textron Stock was an imprudent investment for the Plan. Their fiduciary duties notwithstanding, Defendants failed to protect Participants' retirement savings from being imprudently invested in Textron Stock, and as a result, the Plan suffered losses. A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost millions of dollars.

**Textron's Stock Price Was Artificially Inflated During the Class Period**

**Textron's Statements Concerning Cessna**

69. Throughout the Class Period, Textron reported that Cessna had ever-increasing amounts of backlog – orders for new planes. As forecasts for the economy grew progressively worse, the Company pointed to the increasing backlog at Cessna as a significant

advantage for Textron. However, these positive reports concealed a much more negative reality – that substantial portions of the reported backlog were illusory. As a result of these materially misleading statements about backlog, the price of Textron Stock – and thus, the price of units in the Fund – was artificially inflated during the Class Period. Both because of the underlying problems at Cessna and because of the artificial inflation in the price of Textron Stock, the Plan's investment in the Fund and the Fund's investment in Textron Stock were imprudent.

70.     Textron's reports of "record" backlog occurred throughout the Class Period; most were made in SEC filings that were incorporated by reference in the Company's SPD. For example:

(a)     On July 19, 2007, Textron filed a Form 8-K with the SEC which announced its financial results for the second quarter ended June 30, 2007 (the "July 19, 2007 8-K Report"), in which it reported that Cessna's backlog had increased to $10.4 billion at the end of the second quarter of 2007, and stated that strong demand for its products led Textron to raise its earnings and cash flow outlook for the year.

(b)     In a Form 10-Q Report filed with the SEC on July 27, 2007 (the "Q2 2007 10-Q"), Textron reported that new business jet orders at Cessna outpaced deliveries by 2.5-1 in the first half of 2007.

(c)     On October 18, 2007, Textron filed a Form 8-K with the SEC (the "October 18, 2007 8-K Report"), which reported 608 new orders for business-jets during the quarter, increasing Cessna's backlog to an "all-time high of $11.9 billion."

(d)     On January 24, 2008, Textron filed a Form 8-K with the SEC (the "January 24, 2008 8-K Report"), announcing its financial results for the fourth quarter ended December 29, 2007, which stated that Cessna's reported backlog at year-end was $12.6 billion, up 48% from $8.5 billion at year-end 2006.  The 8-K report included comments from Textron CEO Lewis Campbell ("CEO Campbell") stating that "we expect another banner year of business jet orders exceeding current year deliveries" and indicating that "our jet backlog already extends well into 2009."

(e)     On February 20, 2008, Textron filed a Form 10-K with the SEC for the fiscal year ended December 29, 2007 (the "2007 10-K Report"), which stated that "[d]emand in the business jet market continued to strengthen in 2007, which was reflected in a 49% increase in our backlog."

(f)     On or about April 17, 2008, Textron filed a Form 8-K with the SEC (the "April 17, 2008 8-K Report"), announcing its financial results for the first quarter ended March 29, 2008, which reported 235 new business-jet orders at Cessna, bringing its backlog to $14.5 billion, up $1.9 billion from year-end 2007.

(g)     On or about July 17, 2008, Textron filed a Form 8-K with the SEC (the "July 17, 2008 8-K Report"), announcing its financial results for the second quarter ended June 28, 2008.  Cessna reported 437 new business jet orders for the first-half of 2008 bringing its backlog to $16.0 billion. CEO Campbell remained positive, stating:  "We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong and led to another record level of backlog." On the same day, during an interview at the Farnborough International Air Show, Cessna's Vice President of International Sales stated

24

that Cessna's business jet market "doesn't seem to be suffering at all." Susanna Ray and Courtney Dentch, *Textron Drops Most in 5 Years on 3rd-Quarter Earnings Forecast,* Bloomberg News (July 17, 2008).

(h)     On October 16, 2008, Textron filed a Form 8-K with the SEC (the "October 16, 2008 8-K Report"), attached to which was a press release announcing "restructuring" charges of $25 million for worker layoffs and consolidations.  However, the October 16, 2008 press release tempered this bad news by reporting record backlog:  "Cessna backlog at the end of the third quarter was $15.6 billion, up $3 billion from the end of last year, reflecting 484 jet orders taken year-to-date, with 47 jet orders in the quarter."

(i)     An Aviation Week article entitled, *Bad News Abounds for Textron,* published on October 20, 2008, noted Textron's mounting problems, but observed that CEO Campbell remained upbeat concerning Cessna during his conference call with analysts. As the article noted:

> Cessna has an order backlog for more than 1,500 business jets, Campbell said, adding that the aircraft manufacturer's sales and marketing personnel are maintaining close contact with customers to keep track of any possible change in order status. There are a number of business jet customers who have expressed a desire to take delivery of aircraft sooner than originally scheduled who could help take up the slack if there are order cancellations by other customers, he said.

(j)     On January 29, 2009, Textron filed a Form 8-K with the SEC (the "January 29, 2009 8-K Report"), announcing its results for the fourth quarter and full year 2008, attached to which was a press release that reported that Cessna backlog at the end of the fourth quarter was $14.5 billion, up $1.9 billion from the end of the prior year.

71.     Analysts following Textron focused on the Company's positive representations about Cessna.  For example, on August 13, 2007, the Company's Stock price rose after Credit Suisse analyst Nicole Parent upgraded Textron Stock to "Outperform" from "Neutral," noting the increasing backlog within the Cessna unit and that the Cessna unit "continues to fly high." Carl Gutierrez, *Textron Takes Off on Ratings Rise,* Forbes.com (August 13, 2007).

72.     However, the Company's positive statements about backlog at Cessna in fact concealed mounting problems with demand for the Company's private jets.  During the Class Period:

(a)     Textron was accepting orders for business jets from a growing number of customers that were mere startup and/or financially distressed fleet operators who neither intended to, nor possessed the financial resources to, pay for or take delivery of aircraft during 2009 and beyond; this materially inflated Textron's "backlog" of unfilled orders for the Company's Cessna segment, which in turn materially overstated the Company's current financial condition and future prospects;

(b)     Hundreds of orders reported as backlog at Cessna for future business-jet production were subject to deferral and cancellation;

(c)     Cessna was experiencing increased, undisclosed order cancellations. Textron was entitled to keep customers' down payments at the time of cancellation.  Doing so, however, would also require Textron to remove these orders from its books.  Rather than jeopardize its reported backlog, the Company instead convinced customers to maintain their contracts by allowing them to keep their deposits and delaying their orders for a period of a number of years.  By providing this alternative to cancellation, Textron was able to report an increased backlog.

73.     The poor quality of Cessna's backlog began to be disclosed in January of 2009. In a conference call on January 29, 2009, Textron President Scott Donnelly said that Cessna canceled 23 orders and deferred an "unprecedented level" of deliveries during the fourth quarter of 2008.  Because of these cancellations, Textron had to scale back its projected fiscal

2009 business-jet production and initiate costly production cutbacks and worker reduction programs which eroded Textron's revenues and earnings.

74.     On April 28, 2009, Textron filed a Form 8-K with the SEC (the "April 28, 2009 8-K Report"), reporting its financial results for the first quarter of 2009. The Company reduced its earnings estimate for 2009, due in part to lower expected demand at Cessna, and acknowledged that, during the first quarter of 2009, there were 92 net Cessna cancellations and most of the Company's commercial markets had experienced further softening. In the Cessna division, profit fell 57 percent, primarily due to the lower volume and higher inventory write-downs for used aircraft.

75.     During an investor conference on May 19, 2009, CEO Campbell admitted that he did not expect jet sales to improve over the next year and that the market for Cessna's products would likely not recover until a year and a half after corporate America's return to profit growth. Scott Malone, *Textron Sees Corporate Deliveries Down in 2010,* Reuters.com (May 19, 2009). As the article noted:

> Textron's Cessna unit, the world's largest maker of corporate aircraft, now expects to deliver 290 to 300 planes this year, down from 467 in 2008. It is cutting its staff by about 45 percent, to a target of 8,900 people by the year's end, and postponed plans for a new class of larger aircraft as it looks to cut costs.
>
> Cessna will face a large number of order cancellations in the second quarter as a result of the decision to suspend that larger aircraft, which would have been called the Columbus.

76.     As a consequence of the above facts, Defendants knew or should have known that Textron Stock was an imprudent investment for the Plan, and should have taken steps to protect Participants' retirement savings from being imprudently invested in Textron Stock.

Defendants' failure to do so was a breach of their fiduciary duties of prudence and loyalty which caused the Plan to suffer losses.

**Textron's Statements Concerning Bell Helicopter**

77.    Throughout the Class Period, Textron routinely reported strong – and generally increasing – backlog in its Bell Helicopter segment: $3.6 billion for Q2 2007, $3.65 billion for Q3 2007, $3.8 billion for Q4 2007, $5.2 billion for Q1 and Q2 2008, $5.3 billion for Q3 2008, and $6.2 billion for Q4 of 2008 (after Q4 2008, the Company reported lower backlog). These backlog amounts were included in reports filed quarterly with the SEC and incorporated by reference in the SPD. Most of Bell Helicopter's backlog involved contracts with the U.S. Military. However, these positive reports concealed severe problems with Bell Helicopter's military contracts.

78.    Beginning in April 2008, Michael Prieto ("Prieto"), then President and Chief Executive Officer of Bell Aerospace Services Inc. ("Bell Aero"), a subsidiary of Bell Helicopter, reported numerous potential fraud and ethics violations concerning mischarging for labor on contracts with the U.S. Department of Defense. According to court documents filed by Prieto, he was instructed by the Senior Vice President Quality and Chief Compliance Officer of Bell Helicopter to "immediately cease" any "ancillary investigation" he was conducting. On May 19, 2008, Prieto notified the U.S. government, through the Defense Contract Management Agency, about his discoveries regarding the labor mischarging. On May 29, 2008, Prieto revealed that his investigation had uncovered (i) fraud on U.S. government contracts; (ii) that several employees signed statements that they were directed by management to mischarge; (iii) employees' concerns about management retaliation; (iv)

management's breach of confidentiality; (v) that one member of management was suspended pending the investigation; and (vi) that the investigation was continuing.

79.     On October 16, 2008, the U.S. Department of Defense announced that it was canceling a $6.2 billion Army contract with Bell Helicopter unit to build hundreds of Armed Reconnaissance Helicopters. As MarketWatch reported, "[t]he contract had been under Pentagon and congressional scrutiny for months after a series of problems, including the crash of the prototype helicopter, threw the program four years behind its originally scheduled delivery in 2009." Ingrid Pedrick, *Textron Confirms Pentagon Cancels Helicopter Program,* MarketWatch.com (Oct. 17, 2008).

80.     On or about October 22, 2008, word surfaced that Bell Helicopter unit agreed to a reduced profit on a $210.1-million government contract to upgrade Huey helicopters, to offset the added cost to the government of fixing a "design flaw" in a rotor blade component. The Company also agreed to a reduced fee on a second contract.  The H-1 Huey upgrade was one of Bell Helicopter's largest Department of Defense contracts, along with the V-22 Osprey. Tony Capaccio, *Textron Sees Little Profit in Huey Upgrades,* Bloomberg News (October 23, 2008).

81.     As a result of these numerous, undisclosed problems with Bell Helicopter's military contracts, the price of Textron Stock – and thus, the price of units in the Fund – was materially inflated during the Class Period.  Both because of the underlying quality problems with Bell Helicopter's military contracts, and because of the inflation in the price of Textron Stock, the Plan's investment in the Fund, and the Fund's investment in Textron Stock, was imprudent.

**Textron's Statements Concerning Textron Financial**

82.     During the first part of the Class Period, Textron routinely reported that its finance segment had a large quantity of high-quality receivables, generating solid revenue and profits despite deteriorating conditions in the market generally.  However, this picture was deceptive, as Textron Financial in fact had engaged in lending practices that increased the Company's exposure to losses.  These undisclosed problems began to be evident during the Class Period.  As a result, the price of Textron Stock – and thus, the price of units in the Fund – was artificially inflated during the Class Period.  Because of the undisclosed underlying problems at the finance unit, the Plan's investment in the Fund and the Fund's investment in Textron Stock were imprudent.

83.     Textron's positive reports concerning the performance of the finance segment occurred in 2007 and the first half of 2008; they were made in SEC filings that were incorporated by reference in the Company's SPD.  For example:

(a)     In July 19, 2007 8-K Report, Textron reported that the finance segment's revenues and profits increased compared to the prior year due in part to "higher average finance receivables."

(b)     In the Q2 2007 10-Q Report filed July 27, 2007, Textron reported that the finance segment "continued to grow its managed finance receivables" and improve "our already strong portfolio quality statistics."  As a result, Textron reported increased revenue and profit for Textron Financial.

(c)     In the October 18, 2007 8-K Report, Textron reported that it was able to decrease its provision for loan losses in the finance segment.  In the Q3 2007 Form 10-Q

Report filed on October 29, 2007, Textron reported that Textron Financial "experienced continued growth in its managed finance receivable portfolio" with both revenue and profit increasing over the comparable quarter in 2006.

(d)     In the January 24, 2008 8-K Report, Textron reported that portfolio quality for the finance segment "continues to be strong."  The 2007 10-K Report, filed February 20, 2008, reported that revenue and profit had increased for the finance segment in 2007, reported growth in managed finance receivables and solid portfolio quality, and predicted continued growth in receivables and stability in portfolio quality.

(e)     The April 17, 2008 8-K Report again reported higher revenues, due in part to "higher average finance receivables."  However, an increase in provision for loan losses caused profits for the finance segment to drop, and the Company reported that the amount of nonperforming assets had increased, but still "within a normal range."

84.     These positive statements about the quality and quantity of its finance receivables concealed substantial problems with the Company's lending practices:

(a)     Textron had implemented a Company-wide policy of relaxing lending requirements in order to increase its volume of sales.

(b)     As a result of its lenient credit practices, Textron was experiencing increased defaults by purchasers who did not have the means to pay for Textron's luxury products, such as private jets.

(c)     Beginning in 2007, certain divisions of Textron Financial were approving unworthy credit lines in order to increase sales.

(d)     Textron employees were reporting a deterioration of the Company's credit portfolio as a result of defaults, late payments and decreased credit-worthiness of borrowers.

(e)     Customers' inability to make payments on their purchases, were memorialized in reports that were then used to develop, track and update monthly and annual forecasts.

(f)     The finance segment had incurred material losses in the fair market value of its finance receivables and other financial assets which were omitted from or misrepresented in the Company's periodic reports of earnings and income.  As a result, Textron was reporting artificially inflated financial results and its financial statements were not prepared in accordance with GAAP.

85.     Beginning with the second quarter of 2008, the problems with the finance segment began to become more evident.

(a)     On June 13, 2008, Textron filed a Form 8-K with the SEC (the "June 13, 2008 8-K Report"), which announced that Textron was lowering its earnings forecast for the second quarter of 2008 due to losses at its finance unit.

(b)     The July 17, 2008 8-K Report reported that the finance segment's revenue and profit had declined significantly, the percentage of its receivables that were over sixty-days delinquent in payment almost doubled from the end of the first quarter of 2008 to the end of the second quarter, and nonperforming assets "increased to 2.31 percent of total finance assets from 1.84 percent at the end of the first quarter."

(c)     The October 16, 2008 8-K Report announced that Textron was downsizing Textron Financial by "exiting its Asset Based Lending and Structured Capital segments, and several additional product lines through an orderly liquidation."  The Company also announced "restructuring" charges of $25 million for worker layoffs and consolidations. The measure would include more than 100 job cuts, or 9 percent of the finance unit's workforce.

(d)    The October 16, 2008 8-K Report also stated that the Company expected to take a non-cash impairment charge in the fourth quarter of up to $169 million in connection with the downsizing of Textron Financial.  In addition, the press release reported that revenues for the finance segment decrease $30 million in the quarter, borrowing costs increased, "[s]ixty-day plus delinquencies increased to 1.06 percent of finance receivables from 0.61 percent at the end of the second quarter" and "[n]onperforming assets increased to 2.67 percent of total finance assets . . . ."

(e)    On October 29, 2008, Textron filed a Form 10-Q with the SEC (the "Q3 2008 10-Q"), which re-affirmed the financial losses of its finance segment for the third quarter 2008.  On top of the disclosures made in the October 16, 2008 8-K Report, Textron added that:

> We expect nonperforming assets and charge-offs to remain high for the remainder of 2008 compared to the strong portfolio performance of 2007.  As a result of this trend, we have increased our allowance for losses on finance receivables by $48 million, or 54%, during the first nine months of 2008.

(f)    On December 16, 2008, Standard & Poor's lowered its rating on the finance unit to BBB- from A-, noting that Textron would need to inject additional capital into its finance division.

(g)    On December 22, 2008, Textron announced that the Board of Directors had approved plans to exit all of Textron Financial's commercial lending activities except for "captive financing" activities related to product sales in the Company's manufacturing segments. Approximately $7.9 billion of Textron Financial's $11.4 billion total financial assets were put on the block for "orderly liquidation" or "selective sales." Textron belatedly

reported that $3.5 billion of Textron Financial's "managed receivables," $1.5 billion of which were sold to investors through securitizations, had degraded in value resulting in prospective fourth quarter 2008 pre-tax charges of $250-$300 million and requiring Textron to inject $600 million in capital to its financial segment under an existing support agreement. The Company announced further workforce reductions resulting from production cutbacks bringing total estimated restructuring costs to $65 million.

(h)     On February 26, 2009, Textron filed a Form 10-K for the fiscal year ended January 3, 2009 (the "2008 10-K Report"). The 2008 10-K Report stated that the finance segment's revenues decreased $152 million, and its profits decreased $272 million, from 2007 to 2008. This caused overall profit for all of the Company's segments to decrease by $116 million, or 7%, to $1.5 billion in 2008, compared with 2007." The 2008 10-K Report further stated that Textron had taken "special charges" of $293 million for reclassifying certain finance receivables from held for investment to held for sale, a goodwill impairment charge in the finance segment of $169 million and restructuring charges of $64 million.

**The Results of Textron's Efforts to Bolster Its Stock Price**

86.     Textron and its executives attempted to paint an extremely rosy picture of the Company's prospects from early in the Class Period until the fall of 2008. However, in light of the problems with Cessna, Bell Helicopter, and Textron Finance described above, these financial projections, opinions, and positive statements concerning the Company's fiscal 2008 operations were lacking in a reasonable basis when made and therefore were materially misleading. As a result, the price of Textron's Stock became inflated during the Class Period. As information concerning the many problems at the Company began to come out, the

inflation was removed, making the Company's precarious condition evident to the market at large and causing the price of Textron Stock – and thus, the value of assets in the Fund – to plummet.

87.     The July 19, 2007 8-K Report stated that Textron "expects full-year 2007 revenues will be up about 12% from last year, while earnings per share from continuing operations are now expected to be between $6.35 and $6.55, $0.25 per share higher than its previous guidance."  At the close of trading that day, the price of Textron Stock was $58.45 per share, up from $55.21 at the prior day's close.

88.     In the October 18, 2007 8-K Report, Textron reported revenue of $3.3 billion, up 15% from the previous year.  Textron raised its 2007 earnings guidance for the second quarter in a row, increasing 2007 earnings estimates by $0.22 to $3.40 – $3.50 per share. Textron commented on its "strong" third quarter results stating in pertinent part as follows:

> "Once again, we delivered an excellent quarter with strong organic revenue growth and improved profitability," said Textron Chairman, President and CEO Lewis B. Campbell.  "Our sustained strong operating performance allowed us to exceed our financial targets while continuing to invest in our longer-term growth."
>
> Campbell added, "We see strong end-market demand continuing through the rest of the decade, which in concert with the benefits of our ongoing Transformation strategy, positions us to deliver significant growth in earnings, cash flow and shareholder value."

89.     At the close of trading that day, the price of Textron Stock was $64.22 per share, up from $61.61 at the prior day's close.

90.     The Q3 2007 10-Q Report, filed on October 29, 2007, stated that Textron:

> ***delivered another solid quarter, with many indications that our growth will continue into the future***. We achieved a 40% increase in

earnings per share from continuing operations on a 15% increase in revenues compared to the third quarter of 2006.

(Emphasis added).

91.     The January 24, 2008 8-K Report reported a 32% increase in earnings per share from continuing operations on an 18% revenue increase.  For the full year, Textron's earnings of $3.59 per share exceeded the high-end of its guidance range by $0.09.  Textron also issued earnings guidance for 2008.  The January 24, 2008 8-K Report stated in pertinent part as follows:

### 2008 Outlook

Textron expects 2008 revenues to be about $15 billion, up 13%, and earnings per share to be between $3.75 and $3.95.  First quarter earnings per share are forecasted to be between $0.75 and $0.85 per share.  Textron's outlook fully includes the 2008 development costs for the large cabin Citation program.

The company expects 2008 free cash flow in the range of $700 - $750 million, reflecting expected capital expenditures of about $550 million.

Campbell commented, *"While we expect softening and maybe even a temporary downturn in the U.S. economy in 2008, we believe we are particularly well positioned given our strong aircraft and military backlogs and history of prudent underwriting at Textron Financial. Even with the softer U.S. economy, we expect another banner year of business jet orders exceeding current year deliveries.*  Given that our jet backlog already extends well into 2009, this bodes well for continued, uninterrupted growth well into the next decade at Textron."

(Emphasis added).

92.     In the April 17, 2008, 8-K Report, Textron increased its forecast for 2008 earnings by $0.05 per share to a range of $3.80 and $4.00.

93.     On or about June 13, 2008, Textron filed a Form 8-K with the SEC (the "June 13, 2008 8-K Report"), which was released after the close of the market, announcing that the

Company was reducing its earnings forecast for the second quarter 2008 due to lower earnings in its Finance segment. CEO Campbell attempted to downplay the significance of this action by pointing to strength in Textron's other business units -- units which were in fact experiencing their own problems: "Despite further softening in our commercial finance business, 2008 is shaping up to be another very good year for Textron overall as we continue to see strong demand and performance at Cessna, Bell Helicopter and Textron Systems." Despite Campbell's reassurances, the price of Textron Stock dropped from $56.54 at the close of the market on June 13, 2008 to $52.88 the next trading day, and continued to slide during the rest of June and July.

94. Textron continued to downplay its problems. In the July 17, 2008, 8-K Report, filed before the market opened, Textron gave a lower-than-expected profit forecast for the third quarter of 2008, yet CEO Campbell remained positive, stating:

> We achieved 19% organic growth in our aerospace and defense businesses, as global demand remained very strong and led to another record level of backlog. Likewise, we had double-digit organic growth at E-Z-GO, where our new golf car has been well received, and Fluid & Power where our energy-related products are in high demand.

95. Despite Textron's repeated rosy depictions of its financial condition, on September 16, 2008, analysts downgraded Textron to "Hold" from "Buy" citing deteriorating profit margins in Textron's manufacturing segments and higher debt indicating "poor debt management" within the Company's finance segment.

96. Following this downgrade, the price of Company Stock dropped approximately ten percent at $31.51 on September 17, 2008.

97.     On September 26, 2008, Reuters News published a diary of impending earning releases indicating analysts' consensus earnings for Textron were down $0.06 ($0.89 v. $0.95) for the third quarter 2008 compared to the same period last year.  Textron Stock fell $4.89 per share, or 15%, from $31.86 to close at $26.97 on volume of more than 10 million shares.

98.     The October 16, 2008, 8-K Report continued the drum-beat of bad news, including "restructuring" charges of $25 million for worker layoffs and consolidations. The measure would include more than 100 job cuts, or 9% of the finance unit's workforce.  In addition, the Company reported earnings of $0.84 per share, $0.05 below analysts' estimates, and $0.16 per share below the same period during 2007. Rob Stallard, an analyst with Macquarie Capital Ltd. in New York, noted, "This is hardly the best time to be missing expectations, slashing guidance and trying to sell an unwanted business."  Courtney Dentch and Susanna Ray, *Textron to Shrink Finance Unit, Suspend Buybacks,* Bloomberg.com (Oct. 16, 2008).

99.     At the close of trading on October 16, 2008, the price of Textron Stock had declined to $19.76 per share.  Following the October 16, 2008 announcement, shares fell to a new 52-week low closing at $11.46 on October 23, 2008. As another indication of the decline in investor confidence, Textron Financial's five-year credit-default swaps more than doubled between September 23, 2008 and October 16, 2008, to 539 basis points, according to CMA Datavision in London.

100.    On or about October 22, 2008, Textron was cut to "underweight" from "equal weight" by Morgan Stanley.

101.    On October 26, 2008, the price of Textron Stock fell even more after Moody's Investors Service lowered its outlook on the Company's debt to "negative." Moody's stated that it was "uncertain how much the [financial] subsidiary's portfolio may weaken due to credit market trouble."

102.    At the close of trading on October 29, 2008, Textron Stock traded at $14.39 per share, a drop of approximately 76% from its closing price of $59.48 per share on April 25, 2008, the date that Textron filed its Form 10-Q for the first quarter 2008.

103.    Following Textron's December 22, 2008, announcement that it was exiting all of Textron Financial's commercial lending activities except for "captive financing" activities related to product sales in the Company's manufacturing segments, Textron stock closed at $12.13 per share on December 23, 2008, a drop of 21% compared to the opening trading price of $15.27 per share on December 22, 2008, constituting its biggest drop in seven years. Further, Moody's Investors Service cut its rating on Textron and Textron Financial to Baa1 from A3.

104.    Following the disclosures of losses and "unprecedented" levels of cancellations at Cessna and large losses in the finance segment in the January 29, 2009, 8-K Report, Textron Stock dropped to a January 29 closing price of $9.03 per share on exceptionally high trading volume, marking a decline of more than 31% compared to the closing price of $13.22 per share on January 28, 2009 – an enormous decline from the Class Period high close of $73.38.

105.    On February 3, 2009, Textron credit default swaps became more expensive after Standard & Poor's warned that it might cut its ratings on Textron.

106.     On February 4, 2009, Textron's Stock fell sharply after the Company drew down its $3 billion bank line. The Company said it tapped the credit line because the commercial paper market was not sufficient to meet the Company's funding needs. This move sparked liquidity concerns and sent the price of Company Stock to its lowest level in 18 years. Gopal Ratnam and Susanna Ray, *Textron Says $3 Billion Draw 'Takes Pressure Off',* Bloomberg News (February 5, 2009). Moody's immediately placed the Company on review for a ratings downgrade, citing "increasing uncertainty in the timing of collections of TEXTRON FINANCE CORP.'s finance receivables and other actions to raise cash, and potentially weaker cash flow from the Cessna business jet unit." Wallace Witkowski, *Moody's May Downgrade Textron on Credit Line Draw,* MarketWatch.com (February 4, 2009).

107.     Also on February 5, 2009, analysts at J.P. Morgan cut its rating on Textron to neutral from overweight, citing liquidity concerns with Textron Financial and "management's subpar track record on execution."

108.     On February 9, 2009, the Company announced the departures of both Chief Financial Officer Ted French and head of subsidiary Textron Financial Buell "Jay" Carter. As The Wall Street Journal observed, "the sudden departures follow major fourth-quarter losses by the financial unit and the threat of a downgrade of the helicopter and private-jet maker's credit rating."

109.     In addition to reported decreased in profits and special charges, the 2008 10-K Report, filed on February 26, 2009, also detailed a major downsizing occurring at Textron:

> In October 2008, we initiated a restructuring program to reduce overhead cost and improve productivity across the company. On December 22, 2008, the Textron Board of Directors approved an

expansion of this previously announced plan, which includes corporate and segment direct and indirect workforce reductions and streamlining of administrative overhead. ***The program, along with other volume-related reductions in workforce during the fourth quarter of 2008 and in January 2009, eliminates approximately 6,300 positions worldwide, representing approximately 15% of our global workforce.***

We recorded pre-tax restructuring costs of $64 million in the fourth quarter of 2008 related to this restructuring program and the Finance segment exit plan, excluding volume-related direct labor reductions, which are recorded in segment profit. In the first half of 2009, we estimate that we will incur an additional $40 million in pre-tax restructuring costs, largely related to workforce reductions at Cessna. We may have additional restructuring costs as a result of further headcount reductions and other actions; however, an estimate of additional charges cannot be made at this time.

(Emphasis added).

110.    These announcements caused the Company's Stock price to decline still farther. At the close of trading on February 26, 2009, the price of Textron Stock had fallen to $5.76 per share, down another 36% compared to the closing price on January 29, 2009, the date that Textron issued its press release disclosing fourth quarter and full-year 2008 financial results.

111.    On April 15, 2009, Textron was downgraded by Citigroup analyst Jeffrey Sprague, who cited Citigroup's "increasingly pessimistic view of Cessna, the industrial portfolio and a higher loss assumption at" Textron's finance unit. Sprague lowered his profit estimates for Textron through 2011 and reduced his delivery projection for Cessna by 50 planes per year.

112.    In addition to reporting substantial additional cancellations and losses in the Cessna segment, the April 28, 2009 8-K Report stated that Textron's profit for the first quarter of 2009 fell 63 percent to $86 million, compared to $231 million during the prior year period. The Company reduced its earnings estimate for 2009, due to lower expected demand at Cessna and higher losses at Textron Financial.  Following this news, citing "sharply lower

earnings and cash flow at Cessna," Moody's Investor Service cut Textron's debt rating and changed its outlook to "negative." Ted Nesi, *Textron to Cut 1,200 Jobs as Profit Drops: Revenue Shrinks on Fewer Cessna Sales, Rising Loan Losses,* Providence Business News, PBN.com (April 29, 2009).

113.    On May 20, 2009, the Providence Business News noted that Textron "continued to be dragged down by its shrinking finance unit and falling sales of airplanes by its Cessna division."

114.    Throughout the Class Period, Defendants knew or should have known that Textron Stock and the Fund were imprudent Plan investments because of the material, undisclosed adverse information alleged above, and because Defendant's materially false or misleading statements and/or omissions alleged above artificially inflated the price of Textron Stock.

**Objective Financial Measures Also Demonstrated that Textron Had Become An Imprudent Investment for Participants' Retirement Savings**

115.    As set forth in detail above, Defendants were responsible for the prudent management of Plan investments, including Textron Stock (and the Fund) in the Plan.  A prudent fiduciary in like circumstances would have evaluated objective measures of Textron's financial conditions and acted accordingly to protect the Plan from large losses.

116.    Throughout the Class Period, Textron's financial condition deteriorated as described above, causing objective measures of financial health to plunge, indicating that Textron faced a substantial risk of bankruptcy.

117. Beginning in December of 2008, the three major credit rating agencies investors rely upon to judge the financial risk of potential investments – Moody's, Standard and Poor's and Fitch, repeatedly downgraded Textron's debt and preferred stock. Of particular significance, on April 28, 2009, Moody's downgraded Textron's subordinated debt, and Fitch downgraded Textron's senior unsecured debt, to "non-investment grade" – also known as "junk." Where debt – which takes priority over stock in the event of bankruptcy – is rated as "junk," it is wholly unreasonable for prudent fiduciaries to keep Plan assets invested in Company Stock.

118. The Altman Z-Score ("Z-Score"), developed in 1968 by Prof Edward I. Altman of the Stern School of Business at New York University, is a bankruptcy prediction model commonly accepted and used by financial analysts for predicting the likelihood of a company filing for bankruptcy. See National Wildlife Federation v. EPA, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding Federal agency's use of the Z-Score bankruptcy analysis, finding that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

119. A Z-Score greater than 2.99 is the "safe zone" - meaning a company is unlikely to go bankrupt; a score of 1.88 to 2.99 is a the "grey zone" and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.

120.     Using Textron's financial data that it disclosed in July, 2009, Textron's Z-Score was 1.68.[2]

121.     Textron's Z-Score thus indicates, objectively, that Textron was on the verge of bankruptcy and that any Plan investment in Textron securities, including the Fund, was imprudent.

122.     Additionally, throughout the Class Period, Textron Stock plummeted from a Class Period trading high of $74.40 per share on December 10, 2007 to a Class Period trading low of $3.57 per share on March 6, 2009, a decline in value of over 95%.

123.     Even though Defendants knew or should have known these facts, Defendants failed to take any meaningful steps to protect Participants' retirement savings from being imprudently invested in Textron Stock, and as a result, the Plan suffered losses, for which the Defendants are liable.

## CAUSATION

124.     The Plan suffered millions of dollars in losses of vested benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties. Had these same assets been invested in prudent investment alternatives available during the Class Period, the Plan's assets would be greater, as the Textron Stock Fund performed less well than other available and prudent investment alternatives.

---

[2] Bloomberg L.P. (2009).  Textron Inc Altman's Z-Score Model.  Retrieved August 24, 2009, from Bloomberg database.

125.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Textron Stock as an investment alternative when it became imprudent, and divesting the Plan of Textron Stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

126.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plan's assets should not have been invested in the Fund during the Class Period.

127.    As a consequence of the Defendants' breaches, the Plan suffered a significant loss of vested benefits.

128.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan. . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. . . ."

129.    Plaintiffs, the Plan and the Class are therefore entitled to relief from Defendants in the form of:

(a)    a monetary payment to the Plan to make good to the Plan the loss of vested benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)      injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)      reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)      taxable costs and interest on these amounts, as provided by law; and

(e)      such other legal or equitable relief as may be just and proper.

## CAUSES OF ACTION

### COUNT I

### Failure to Prudently and Loyally Manage the Plan and the Plan's Assets

130.    Plaintiffs incorporate by reference the paragraphs above.

131.    This Count alleges fiduciary breach against all Defendants.

132.    As alleged above, during the Class Period, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

133.    As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of the Plan for the sole and exclusive benefit of Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

134.    Yet, contrary to their duties and obligations under the Plan documents and ERISA, Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an imprudent investment in light of the Company's financial condition.

135.    Nonetheless, during the Class Period, these Defendants continued to permit the Plan to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plan to invest those contributions in the Fund and permit the Fund to invest in Company Stock.  Defendants did so despite the fact that they knew or should have known that the prices of Fund and Company Stock shares were both artificially inflated and otherwise imprudent as alleged above.

136.    Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company Stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

137.    Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but, on information and belief, they did not employ any such procedure.  Moreover, on information and belief, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

138.     The Defendants breached their fiduciary duty respecting the Plan's investment in Company Stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

139.     Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

140.     According to U.S. Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

141.     According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> (a)     A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)     Consideration of the following factors as they relate to such portion of the portfolio:

(i)     The composition of the portfolio with regard to diversification;

(ii)    The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(iii)   The projected return of the portfolio relative to the funding objectives of the plan.

142.    Given the conduct of the Company as described above, Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Company Stock.

143.    Defendants knew of and/or failed to investigate the failures of the Company as alleged above.

144.    The risk associated with the investment in Company Stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in Company Stock.

145.    Further, knowing that the Plan was not adequately diversified, but was heavily invested in Company Stock, Defendants had a heightened responsibility to divest the Plan of Company Stock if it became or remained imprudent.

146.    Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning the Plan's investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in

order to avoid adversely impacting their own compensation or drawing attention to the Company's inappropriate practices; and by otherwise placing their own and the Company's improper interests above the interests of the Participants with respect to the Plan's investment in Company Stock.

147.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to Participants, not to mislead them regarding the Plan or its assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan.  This duty to inform Participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that Participants can make informed decisions with regard to investing in such options made available under the Plan.

148.    Defendants also breached their duties of loyalty and prudence by failing to ensure that the Plan liquidated its investment in the Textron Stock Fund and transferred the sale proceeds to the investment options available in the 401(k)/profit sharing component of the Plan.  With actual or constructive knowledge that Participants did not have full and complete information about the Company's problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company Stock, Defendants had the fiduciary obligation to either inform Participants of the need to take action to protect their financial interests or, if necessary, to liquidate the Fund on Participants' behalf to ensure that they did not suffer a financial loss.

149.     Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward Company Stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in Company's Stock.  As such, Participants in the Plan could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

150.     As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, and/or to provide Participants with complete and accurate information regarding Company Stock, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly the Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

151.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Adequately Monitor Other Fiduciaries and
### Provide Them with Accurate Information

152.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.     This Count alleges fiduciary breach against Defendant Textron.

154.     At all relevant times, as alleged above, Textron was a fiduciary, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

155.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of Textron included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Members of the Committee and the other Company officers, employees and agents to whom fiduciary responsibilities were delegated (the "Monitored Fiduciaries").

156.     Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

157. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that Defendant Textron had the duty to:

(a) Ensure that the Monitored Fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Participants;

(b) Ensure that the Monitored Fiduciaries are provided with adequate financial resources to do their job;

(c) Ensure that the Monitored Fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d) Ensure that the Monitored Fiduciaries have ready access to outside, impartial advisors when needed;

(e) Ensure that the Monitored Fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f) Ensure that the Monitored Fiduciaries report regularly to the monitoring fiduciaries; and

(g) Review, understand, and approve the conduct of the Monitored Fiduciaries.

158. Textron breached its fiduciary monitoring duties by, among other things, (a) failing to ensure that the Monitored Fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) failing to ensure that the Monitored Fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation. Textron knew or should have known that the Monitored Fiduciaries were (i)

continuing to invest the assets of the Plan in Textron Stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plan to continue offering Textron Stock as an investment alternative. Despite this knowledge, Textron failed to take action to protect the Plan, and concomitantly the Participants, from the consequences of these Monitored Fiduciaries' failures.

159. In addition, Textron, in connection with their monitoring and oversight duties, were required to disclose to the Monitored Fiduciaries accurate information about the financial condition of Textron that it knew or should have known the Monitored Fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Textron breached its monitoring duties under the Plan and ERISA.

160. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and Participants, lost a significant portion of their retirement investments.

161. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant Textron is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## COUNT III

### Co-Fiduciary Liability

162. Plaintiffs incorporate by reference the allegations above.

163. This Count alleges co-fiduciary liability against all Defendants.

164.    As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and/or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

165.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  Defendants breached all three provisions.

166.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and Participants, lost millions of dollars of retirement savings.

167.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to Participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits

the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which Participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company Stock;

F.      Judgment against Defendants jointly and severally for actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs against Defendants jointly and severally pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: February 2, 2010

Respectfully submitted,

**LAW OFFICES OF**
**STEPHEN R. WHITE**

 /s/ Stephen R. White
Stephen R. White (R.I. Bar # 2372)
200 Centerville Road, Suite One
Warwick, RI 02886
Telephone: (401) 732-3939
Facsimile: (401) 732-0029
e-mail:  steve@srwesq.com

*Co-Liaison Counsel for Plaintiffs*


Edwin J. Mills
Mark Levine
Michael J. Klein
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone:  (212) 687-7230
Facsimile:  (212) 490-2022
e-mail:  emills@ssbny.com
          mlevine@ssbny.com
          mklein@ssbny.com

*Co-Lead Counsel for Plaintiffs*

**MICHAEL K. MARRAN**
Michael K. Marran, R.I. Bar No. 2933
321 South Main Street, Suite 200
Providence, RI 02903
Telephone: (401) 454-4000
Facsimile: (401) 457-7708
e-mail: mmarran@marranlaw.com

**MOTLEY RICE LLC**

 /s/ Vincent L. Greene IV
Vincent L. Greene IV
321 South Main St.
Providence, RI 02903
Telephone: (401) 457-7700
Facsimile: (401) 457-7708
e-mail:  vgreene@motleyrice.com

*Co-Liaison Counsel for Plaintiffs*


Robert A. Izard
Mark P. Kindall
**IZARD NOBEL LLP**
29 South Main St., Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290
e-mail:  rizard@izardnobel.com
          mkindall@izardnobel.com

*Co-Lead Counsel for Plaintiffs*

**D'AMICO • BURCHFIELD, LLP**
Robert A. D'Amico II, R.I. Bar No. 4593
Patrick F. Dowling, Jr., R.I. Bar No. 6863
536 Atwells Ave., Suite 1
Providence, RI 02909
Telephone: (401) 454-1212
Facsimile: (401) 454-1233
e-mail: rad@dblawri.com


**MCINTYRE, TATE & LYNCH, LLP**
Robert S. Parker, R.I. Bar No. 3152
321 South Main Street, Suite 400
Providence, RI 02903
Telephone: (401) 351-7700
Facsimile: (401) 331-6095
e-mail: rsp@mtlesq.com


**HARWOOD FEFFER LLP**
Robert I. Harwood
Roy Shimon
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
e-mail: rharwood@hfesq.com

**MILBERG LLP**
Lori G. Feldman
Arvind B. Khurana
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
e-mail: lfeldman@milberg.com
      akhurana@milberg.com

**JOHNSON BOTTINI, LLP**
Frank J. Johnson
Francis A. Bottini, Jr.
Derek J. Wilson
501 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535
e-mail: frankb@johnsonbottini.com


**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
e-mail: rifkin@whafh.com
guiney@whafh.com

**GLANCY BINKOW & GOLDBERG LLP**
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
e-mail: mgoldberg@glancylaw.com

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Mark K. Gyandoh
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
e-mail: jmeltzer@btkmc.com
        eciolko@btkmc.com
        mgyandoh@btkmc.com

**GAINEY & MCKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
e-mail: tjmckenna@gaineyand
        mckenna.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Vincent L Greene IV, hereby certify that a copy of the foregoing *Consolidated Class Action Complaint* was electronically filed. Those attorneys who are registered with the Electronic Filing System may access these filings through the Court's System, and notice of these filings will be sent to these parties by operation of the Court's Electronic Filing System.

Dated: February 2, 2010

/s/ Vincent L. Greene IV