UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


IN RE TEXTRON INC. ERISA LITIGATION      :
      :
                 v.                       :       Civ. Action No.: 09-383-PJB
                                         :       (Consolidated Actions)
      :
THIS DOCUMENT RELATES TO:            :
ALL ACTIONS                               :


## ADDENDUM TO DEFENDANTS' MOTION TO DISMISS, DOCKET # 33


*Carr v. International Game Technology*,
      No. 09-584, 2011 U.S. Dist. LEXIS 28548 (D. Nev. Mar. 16, 2011).

*Fulmer v. Klein*,
      No. 09-2354, 2011 U.S. Dist. LEXIS 36602 (N.D. Tex. Mar. 16, 2011).

*Griffin v. Flagstar Bancorp. Inc.*,
      No. 10-10610, 2011 U.S. Dist. LEXIS 35080 (E.D. Mich. Mar. 31, 2011).

*Howell v. Motorola, Inc.*,
      633 F.3d 552 (7th Cir. 2011).

*In re Bear Stearns Cos., Inc. Securities, Derivative and ERISA Litigation*,
      No. 08-1963, 2011 U.S. Dist. LEXIS 6026 (S.D.N.Y. Jan. 19, 2011).

*In re R.H. Donnelley Corp. ERISA Litigation*,
      No. 09-7571, 2011 U.S. Dist. LEXIS 2239 (N.D. Ill. Jan. 10, 2011).

*In re UBS AG ERISA Litigation*,
      No. 08-06696 (S.D.N.Y. Mar. 24, 2011) (unreported case, copy attached).

*Wright v. Medtronic, Inc.*,
      No. 09-0443, 2011 U.S. Dist. LEXIS 923 (D. Minn. Jan. 5, 2011).

Dated:  April 13, 2011

/s/  John A. Tarantino
JOHN A. TARANTINO (#2586)
jtarantino@apslaw.com
PATRICIA K. ROCHA (#2793)
procha@apslaw.com
NICOLE J. BENJAMIN (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903
Tel:  401-274-7200
Fax: 401-351-4607

William J. Kilberg, P.C., *pro hac vice*
Paul Blankenstein, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

Mitchell A. Karlan, *pro hac vice*
Brian M. Lutz, *pro hac vice*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

### Certificate of Service

I certify that a true copy of this Addendum was served electronically via the CM/ECF system on all counsel of record on this 13th day of April, 2011.

/s/  John A. Tarantino

*568023_1.docx*

2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Nº 08 Civ. 6696 (RJS)

## IN RE UBS AG ERISA LITIGATION

MEMORANDUM AND ORDER
March 24, 2011

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs, four former employees of UBS AG and UBS Financial Services, Inc., bring this putative class action against UBS[1] and certain of its subsidiaries, committees, committee members, and directors, alleging violations of fiduciary duties imposed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*[2]

Plaintiffs' claims arise out of their participation in two UBS retirement plans, which permitted participating employees to invest their plan contributions into a variety of pre-selected investment funds. One such option was the UBS Stock Fund, which invested exclusively in UBS common stock. From late 2007 through the end of 2008, as UBS sustained substantial losses resulting from the collapsing mortgage-backed securities market, the value of UBS stock declined sharply. Plaintiffs allege that

---

[1] Unless otherwise noted, "UBS" and the "Company" refer to Defendant UBS AG and its wholly-owned subsidiaries, including Defendants UBS Financial Services ("UBSFS") and UBS Americas, Inc. ("UBS Americas").

[2] The Complaint names UBS AG, UBS Americas, and UBSFS as Defendants, as well as the following UBS board members and committee members: Barbara Amone, Stephen Baird, Simon Canning, Ken Castanella, Robert Chersi, Michael Daly, Earle Dodd, Richard Duron, Per Dyrvik, Marilee Ferone, William Frey, Dianne Frimmel, John Hannasch, Marten Hoekstra, Matthew Levitan, Robert McCormick, Ursula Mills, Ed O'Connor, Edward O'Dowd, Kevin Ruth, Joe Scoby, Jaime Taicher, Michael Weisberg, Raoul Weil, Robert Wolf, and Rhonda Viapiano.

Defendants — UBS entities and executives with knowledge of the Company's financial well being — breached their fiduciary duties to plan participants by continuing to offer the UBS Stock Fund as an investment option after they knew it was no longer prudent to do so.

Before the Court is Defendants' motion to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motion is granted.

## I. BACKGROUND

### A. Facts[3]

UBS is a Swiss bank and global financial institution that, along with its subsidiaries, provides wealth management and banking services to clients worldwide. (Compl. ¶ 16.) In 2005, as part of a strategy to grow its investment banking business in the United States market, UBS began acquiring a large inventory of securities backed by subprime mortgages. (Id. ¶¶ 99, 103-04.) Over the next several years, UBS steadily increased its investment in these securities and, by the end of 2007, UBS had accumulated a $100 billion portfolio of securities backed by subprime mortgages in the United States. (Id. ¶ 103.)

---

[3] The following facts, unless otherwise noted, are taken from the Consolidated Amended Class Action Complaint (the "Complaint") and from documents attached thereto, incorporated therein by reference, or otherwise integral to Plaintiffs' claims, even if not explicitly incorporated by reference. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Police & Fire Ret. Sys. of Detroit v. Safenet, Inc., 645 F. Supp. 2d 210, 224 (S.D.N.Y. 2009). For purposes of this motion, all facts alleged in the Complaint are presumed to be true and all reasonable inferences are drawn in Plaintiffs' favor. See ATSI Commc'ns, Inc., 493 F.3d at 98.

Beginning in October 2007, as the mortgage-backed securities market began to collapse, UBS started taking large write-downs of its subprime holdings. (Id. ¶ 120.) These write-downs continued over the following year and, by the third quarter of 2008, UBS had written down approximately $42 billion of its troubled assets. (Id. ¶ 152.)

UBS was also actively involved in the auction rate securities ("ARS") market.[4] (Id. ¶ 142.) UBS made these securities available to its wealth management customers, underwrote auction rate securities on behalf of issuers, and sponsored auctions. (Id.) In late 2007, when the SEC began to closely scrutinize the ARS market, federal and state regulators commenced investigations into UBS's involvement in marketing auction rate securities. (Id. ¶¶ 122, 124, 128.) In order to settle claims brought by these regulators, UBS agreed to buy back $8.3 billion of auction rate securities that it had sold to individual retail customers, paid a $150 million fine, and agreed to "assist" institutional investors holding another $10.3 billion in such securities. (Id. ¶ 128.)

Additionally, in the fall of 2008, UBS came under investigation from the United States Department of Justice for its alleged involvement in aiding wealthy American clients to evade more than $300 million in United States taxes between 2000 and 2007. (Id. ¶ 155.) In February 2009, UBS reached an agreement with the Department of Justice to settle the civil and criminal charges relating

---

[4] Auction rate securities are "long-term bonds with interest rates that are reset and determined through a Dutch auction process." (Compl. ¶ 142.) The Complaint alleges that auction rate securities are risky investments because their liquidity is dependant upon the participation of buyers at the auction. (Id. ¶¶ 142, 144.)

to these allegations for $780 million. (*See* Pls.' Opp'n at 13.)

In October 2008, owing to the financial turmoil caused by these various developments, UBS announced that it was accepting a "bailout" from the Swiss government, pursuant to which UBS transferred $60 billion of its distressed assets to the Swiss National Bank. (Compl. ¶ 161.) In exchange for these assets, UBS received a $54 billion loan from the Swiss National Bank and up to $6 billion in new equity. (*Id.*) This bailout was in addition to $27 billion in capital that UBS had already raised from private investors. (*Id.*)

As a result of these financial troubles, UBS's stock price underwent a significant decline in value. During the putative class period — from March 13, 2007 to October 16, 2008 — the market price for UBS stock fell from $56.02 per share to $17.33 per share, a decline of 69%.[5]

B. The UBS Retirement Plans

Throughout the putative class period, UBS offered two 401(k) savings plans to its employees: (i) the UBS Savings and Investment Plan (the "SIP"), and (ii) the UBS Financial Services Inc. 401(k) Plus Plan (the "Plus Plan").[6] (*Id.* ¶¶ 1, 26, 38, 57.) Each

plan qualified as an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A), and was set up as an "eligible individual account plan" ("EIAP") within the meaning of 29 U.S.C. § 1107(d)(3).[7] As such, each plan permitted participants to make contributions to the plan and then direct the plan's trustee to purchase investments with those contributions from options pre-selected by the fund's administrators. (Compl. ¶¶ 42, 61.) In some cases, UBS made matching contributions to a participant's account. (*Id.* ¶¶ 46, 65.)

Pursuant to the plan agreements, authority to manage the funds was delegated to various committees and individuals. For instance, while UBS was the "named fiduciary" of the SIP, the SIP plan agreement designated the SIP Committee as the entity that was responsible for the day-to-day operation of the plan. (*See* Declaration of Robert J. Giuffra, Jr., dated March 19, 2010, Doc. No. 47 ("Giuffra Decl."), Ex. 8 ("SIP Document") §§ 9.2, 10.1.) The SIP Committee also was given the sole discretion to "instruct and advise" the trustee and plan participants "as to the addition or deletion of an authorized

---

[5] In the Complaint, Plaintiffs alleged that the decline in value was 74%. (Compl. ¶ 86.) In their opposition brief, however, Plaintiffs revised their figures and now allege that UBS's stock price fell 69%. (Pls.' Opp'n at 16.)

[6] The SIP provided retirement benefits to all eligible employees of UBS's United States operations. (Compl. ¶ 44.) The Plus Plan covered substantially all

employees of UBSFS, as well as certain UBSFS subsidiaries and affiliates. (*Id.* ¶ 63.)

[7] An "individual account plan" is a "pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). An "eligible individual account plan" is defined as "an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; [or] (ii) an employee stock ownership plan." *Id.* § 1107(d)(3)(A).

Investment Fund." (*Id.*) Members of the SIP Committee were appointed by the UBS Executive Board.[8] (*See* Compl. ¶ 18.)

The Plus Plan, according to its plan documents, was to be administered by the Plus Plan Administrator, although the Benefits Administration Committee, the Plus Plan's named fiduciary, was given "responsibility for the interpretation and construction of the Plan and final authority with respect to the operation and administration of the Plan." (Giuffra Decl., Ex. 9 ("Plus Plan Document") §§ 10.7(a), 10.8(a).) Responsibility for the selection of the investment funds was given to the Plus Plan Investment Committee, which would determine the "number and category" of investment funds to be offered under the plan. (*Id.* § 10.9(a)-(b).) According to the Complaint, the Plus Plan Administrator, the Benefits Administration Committee, and the Plus Plan Investment Committee were appointed by the UBSFS Executive Committee, whose own members were appointed by the UBSFS Board.[9] (Compl.

¶¶ 28, 30.)

Plan participants had the sole discretion to invest their plan assets entirely in one fund or to spread their assets among multiple funds, and could make changes to their investments at any time. (*See* Compl. ¶¶ 41-42, 60-61; Giuffra Decl., Ex. 11 ("SIP Summary Plan Description") at 23; Giuffra Decl., Ex. 12 ("Plus Plan Summary Plan Description") at 12.) Throughout the class period, SIP members could choose from approximately seventeen options, and Plus Plan members could choose from approximately ninety. (*See* SIP Summary Plan Description at 4; Plus Plan Summary Plan Description at 13.) Each plan offered participants the option of investing in the UBS Stock Fund, a fund invested almost exclusively in shares of UBS common stock.[10] According to the Complaint, as of December 31, 2007, the SIP's investments in the UBS Stock Fund were valued at approximately $89 million. (Compl. ¶ 48.) The Plus Plan's investment in the UBS Stock Fund totaled nearly $725 million, as of December 31, 2006. (*Id.* ¶ 67.)

Following the decline in UBS's share price, both plans suffered substantial losses,

---

[8] The Complaint alleges that, during the class period, four Defendants served on the UBS Executive Board: Joe Scoby, Robert Wolf, Marten Hoekstra, and Raoul Weil. (Compl. ¶ 19.) The Complaint also alleges that nine Defendants served on the SIP Committee: Barbara Amone, Stephen Baird, Simon Canning, Michael Daly, Richard Duron, Per Dyrvik, Ursula Mills, Edward O'Dowd, and Jaime Taicher. (*Id.* ¶ 21.)

[9] The Complaint alleges that, during the class period, the members of the UBSFS Executive Committee were Robert Chersi, Dianne Frimmel, Marten Hoekstra, and Michael Weisberg, each of whom was a member of the UBFS Board of Directors. (Compl. ¶ 29.) The Plus Plan Investment Committee consisted of Defendants Ken Castanella, Earle Dodd, Marilee Ferone, William Frey, Matthew Levitan, Robert McCormick, Ed

O'Connor, Kevin Ruth, and Rhonda Viapiano. (*Id.* ¶ 32.)

[10] The Plus Plan Summary Plan Description ("SPD") explicitly cautioned investors of the risks inherent in a failure to diversify one's investments. In its description of the UBS Stock Fund, for example, the SPD warned investors that, because the fund "invests in the stock of only one company," it is "not diversified," and, therefore, "[p]erformance may deviate substantially from the market due to company-specific or industry-related risks." (Plus Plan Summary Plan Description at 24.)

allegedly "resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plans' participants." (*Id.* ¶ 6.) In an attempt to recover these losses, which Plaintiffs claim are directly traceable to Defendants' breaches of fiduciary duties, Plaintiffs commenced this action alleging six claims: (i) breach of the duties of prudence and loyalty; (ii) breach of the duty of candor; (iii) breach of the duty to monitor; (iv) conflict of interest; (v) co-fiduciary liability; and (vi) equitable relief or quantum meruit.

The gravamen of Plaintiffs' allegations is that, prior to the drop in UBS's stock price, Defendants knew that UBS had overextended itself into a series of risky investments and, as a result, the Company was likely to encounter a period of financial distress. Because of this purported knowledge, Defendants breached their fiduciary duties to participants in the UBS retirement plans by continuing to offer the UBS Stock Fund after it was no longer prudent to do so. Additionally, Defendants failed to disclose to plan participants the information they knew about company stock.

### B. Procedural History

This case, which was originally assigned to the Honorable Victor Marrero, United States District Judge, commenced on July 28, 2008, when Plaintiff Debra Taveras filed her complaint in *Taveras v. UBS AG, et al.* That action was transferred to the docket of the undersigned on August 12, 2008. On October 3, 2008, Plaintiff Taveras' action was consolidated with *Stanislaus v. UBS AG, et al*, No. 08 Civ. 7606, and *Ludlum, et uno v. UBS AG, et al*, No. 08 Civ. 6868, into the instant action. On November 14, 2008, Plaintiffs

filed their Consolidated Amended Class Action Complaint. On March 19, 2010, Defendants moved to dismiss the Complaint, and the motion was fully submitted on May 14, 2010.

### II. STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. By contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'

Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Under this standard, if a plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III. DISCUSSION

To state a claim for breach of fiduciary duty under ERISA, Plaintiffs must adequately allege that (1) Defendants were fiduciaries of the plans who, (2) while acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty.[11]   *See* 29 U.S.C. § 1109; *Pegram v. Herdrich*, 530 U.S. 211, 222-24 (2000).

### A. Count One: Breach of the Duty of Prudence[12]

ERISA imposes on plan fiduciaries a duty of prudence, pursuant to which they must act

---

[11] As noted above, the respective plan documents named the SIP Committee and the Benefits Administration Committee as fiduciaries. Plaintiffs allege that all Defendants, including those who were not members of either committee, are liable as fiduciaries. Because the Court finds that there was no breach of fiduciary duty, it need not decide which Defendants are, in fact, fiduciaries.

[12] Although Count One of the Complaint is styled as a claim for the breach of the duties of prudence and loyalty, the substance of Plaintiffs' allegations with respect to this count solely address the duty of prudence. To the extent the Complaint advances allegations regarding a breach of the duty of loyalty, they will be considered in the context of Plaintiffs' conflict of interest claim (Count Four).

"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In Count One, Plaintiffs allege that Defendants acted imprudently by "allowing the Plans to acquire and hold large quantities of UBS Stock at a time when they were aware or should have been aware that the Company was in serious danger of collapse." (Pls.' Opp'n at 18.)

In two recent cases, this Court addressed the fiduciary duty of prudence in the context of ERISA retirement plans. In both cases, this Court found that, because the ERISA plans at issue limited the fiduciaries' discretion in offering or removing an employer stock fund as an investment option, the defendants were entitled to a "presumption of prudence." *See Herrera v. Wyeth*, No. 08 Civ. 4688 (RJS), 2010 WL 1028163, at *5 (S.D.N.Y. March 17, 2010); *Gearren v. McGraw Hill Co.*, 690 F. Supp. 2d 254, 269 (S.D.N.Y. 2010). This presumption, first articulated by the Third Circuit in *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995), provides that "'[w]hen the terms of the plan agreements require or strongly encourage a fiduciary to take a certain action, and that action is the congressionally approved step of facilitating employee ownership of employer stock, the action should be presumed to be reasonable.'" *Wyeth*, 2010 WL 1028163, at *5 (quoting *Gearren*, 690 F. Supp. at 269.) While the Second Circuit has yet to address the *Moench* decision, "the weight of authority appears to favor the application of the *Moench* presumption." *In re Bear Stearns Co., Sec., Derivative, and ERISA Litig.*, --- F. Supp. 2d

---, 2011 WL 223540, at *133 (S.D.N.Y. Jan. 19, 2011) (citing cases).

### 1. Defendants Are Entitled To A Presumption Of Prudence

In this case, it is clear from each plan's documents that the settlor either required or strongly encouraged the plan fiduciaries to offer the UBS Stock Fund as an investment option to plan participants.

With respect to the Plus Plan, the plan documents expressly mandate that the UBS Stock Fund be offered as an investment option.   Section 11.2 of the Plus Plan Agreement, for example, provides, in relevant part:

> The Trustee shall invest and reinvest all amounts in each Participant's Accounts, as elected by Participants from among the Investment Funds made available by the Investment Committee from time to time, *one of which shall be the [UBS] Common Stock Fund.*

(Plus Plan Agreement § 11.2(a) (emphasis added)).  Moreover, in keeping with ERISA's stated goal of encouraging employee ownership of employer stock, section 1.2 of the Plus Plan Agreement states that the "purpose" of the plan is to "attract and retain qualified individuals by providing them with an opportunity to accumulate assets for their retirement and to acquire [UBS] Common Stock." (*Id.* § 1.2.)  Because the Plus Plan Agreement clearly and explicitly limits the trustee's discretion by requiring that the UBS Stock Fund be offered as an investment

option, the Plus Plan fiduciaries are entitled to a presumption of prudence.

Unlike the Plus Plan Agreement, the SIP documents do not explicitly require that the SIP fiduciaries offer the UBS Stock Fund as an investment option.   In *Wyeth*, however, this Court held that the presumption of prudence applies where the plan agreements, while not explicitly requiring that the plan include an employer stock fund, nevertheless "presuppose the existence of [such a fund]." 2010 WL 1028163, at *6.   Like the plan agreements at issue in *Wyeth*, the SIP documents contain numerous references to the UBS Stock Fund that strongly suggest that the settlor intended the UBS Stock Fund to be one of the funds available to plan members. For example, section 2.1 of the SIP Document defines the UBS Stock Fund as "the portion of the Plan and the Trust Fund invested in UBS Shares . . . [including] such other assets as the Trustee may deem appropriate while assets are awaiting investment in UBS Shares." (SIP Document § 2.1(ll).)   Further, section 9.7 of the SIP Agreement, entitled "UBS Shares," describes the manner in which dividends from the UBS Stock Fund are to be reinvested and details how voting rights for holders of UBS stock are to be administered.   (*Id.* § 9.7(a)-(c).) Significantly, no other fund is explicitly referenced in the SIP documents.

Plaintiffs argue that the fiduciaries of the SIP did, in fact, possess the discretion to remove the UBS Stock Fund because section 9.2 of the SIP Document states that "the Committee may . . . from time to time eliminate any current Investment Fund and/or designate other Investment Funds to be available for the investment of the funds

credited to the Accounts of Members under the Plan" (Pls.' Opp'n at 5-6; *see* SIP Document § 9.2.) Like the plan agreements in *Wyeth*, however, this general provision does not undermine the conclusion that, as illustrated by the plan provisions cited above, the settlor intended to "strongly encourage a fiduciary to . . . facilitate employee ownership of employer stock." *Wyeth*, 2010 WL 1028163, at *5. To the contrary, these provisions of the SIP Document "would be at best incongruous and at worst meaningless if the Fund's very existence was left purely to the discretion of the fiduciaries." *Id.* at *6. As such, the provisions of the SIP Document provide sufficient "evidence of the settlor's clear intent that the Stock Fund be offered as an investment option." *Id.*

Plaintiffs' attempts to differentiate this case from *Wyeth* and *Gearren*, as well as their general arguments as to why the presumption of prudence should not be applied in this case, are unpersuasive. First, there is no merit to Plaintiffs' suggestion that "[c]ourts have consistently refused to apply a presumption of prudence to non-ESOP retirement plans."[13] (Pls.' Opp'n at 20-21.) While the plan at issue in *Moench* was an ESOP, courts after *Moench*, including this one, have found that the presumption of prudence is applicable to all EIAPs. *See Wyeth*, 2010 WL 1028163, at *2; *see also Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008) ("The *Moench* presumption logically applies to any allegations of fiduciary duty breach for failure

to divest an EIAP or ESOP of company stock."); *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790 (SHS), 2009 WL 2762708, at *11 n.5 (S.D.N.Y. Aug. 31, 2009) ("Much of the caselaw in this area addresses ESOPs in particular, not just EIAPs in general. Nevertheless, nearly all of the points made about ESOPs apply equally to EIAPs.").[14]

Plaintiffs also argue that the *Moench* presumption is an evidentiary presumption that should not be invoked on a motion to dismiss. As Plaintiffs note, *Moench* was decided on a motion for summary judgment. (Pls.' Opp'n at 20.) Additionally, there are a handful of cases, many of which were decided prior to *Twombly*, in which a district court declined to apply the presumption at the motion to dismiss stage. *See, e.g., In re Hartford Fin. Servs.*, No. 08 Civ. 1708 (PCD), 2010 WL 135186, at *1-2 (D. Conn. Jan. 13, 2010); *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03 Civ. 1060 (HGM), 2006 WL 2934391, at *22 (N.D.N.Y. Oct. 12, 2006); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp 2d 511, 534 n.3 (S.D. Tex. 2003). In *Gearren* and *Wyeth*, however, this Court applied the presumption on a motion to dismiss — an application consistent with the approach taken by other judges in this district. *See Citigroup*,

---

[13] Under ERISA, an Employee Stock Ownership Plan ("ESOP") is a type of EIAP that "is designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6). The Plus Plan and the SIP are EIAPs but are not ESOPs.

[14] Plaintiffs' reliance on the Third Circuit's decision in *In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231, 236-38 (3d Cir. 2005), for the proposition that the *Moench* presumption applies only to ESOPs is of little persuasive value given that subsequent Third Circuit caselaw makes clear that the presumption of prudence applies to all EIAPs. *See Edgar v. Avaya*, 503 F.3d 340, 347 & n.12 (3d Cir. 2007) ("Edgar argues that *Moench's* presumption of prudence does not apply here, because the Plans at issue in this case are not ESOPs. We are not persuaded.")

2009 WL 2762708, at *16 ("[F]ollowing the Supreme Court's ruling in *Twombly* . . . [courts] have regularly applied *Moench* at the motion-to-dismiss stage." (internal citations omitted)); *accord Bear Stearns*, 2011 WL 223540, at *134; *In re Lehman Bros. Sec. & Erisa Litig.*, 683 F. Supp. 2d 294, 302-03 (S.D.N.Y. 2010).[15]

Accordingly, the Court finds that the decisions made by Defendants with respect to the administration of the UBS retirement plans are entitled to a presumption of prudence.

### 2. Plaintiffs Have Failed To Allege Facts Sufficient To Overcome The Presumption Of Prudence

In order to overcome the presumption of prudence, Plaintiffs must plead facts from which it may be plausibly inferred that, by continuing to make the UBS Stock Fund available to plan members, Defendants abused their discretion as fiduciaries. *See Lehman Bros.*, 683 F. Supp. 2d at 301. To make such a showing, it is insufficient for Plaintiffs merely to allege that Defendants

---

[15] The sole post-*Twombly* case from this district that Plaintiffs cite in support of their position is *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, (S.D.N.Y. 2009), a case in which Judge Sweet found that "the presumption of prudence [is] inappropriate for resolution on a motion to dismiss," *id.* at 358-59. In a subsequent opinion, however, Judge Sweet changed his position and applied the presumption at the motion to dismiss stage. *See Bear Stearns*, 2011 WL 223540, at *133 (finding that recent caselaw from within this district "compel[s] the conclusion that the Court's holding in *Morgan Stanley* is no longer appropriate" (internal citation omitted)).

"were aware of 'circumstances that may impair the value of company stock.'" *Bear Stearns*, 2011 WL 223540, at *134 (quoting *Kirschbaum*, 525 F.3d at 256). Rather, Plaintiffs must plead "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id.* (internal quotation marks omitted); *see Lehman Bros.*, 683 F. Supp. 2d at 301 (stating that an abuse of discretion is established only by allegations of "the fiduciary's knowledge at a pertinent time of an imminent corporate collapse or other dire situation" (internal quotation marks omitted)).

Plaintiffs highlight several of the Complaint's allegations that they claim sufficiently demonstrate an abuse of discretion. The Complaint alleges, for example, that the plans' fiduciaries, many of whom held senior leadership positions at UBS, had knowledge of the "unreasonable and entirely predictable losses" that would befall plan participants. (Compl. ¶ 182.) Further, Plaintiffs argue that Defendants failed to investigate various "red flags" that should have triggered an inquiry by Defendants. (Pls.' Opp'n at 28.) Specifically, Plaintiffs allege that Defendants should have known about the risks posed by subprime exposure and never properly assessed the level of risk that the Company faced. (Compl. ¶¶ 105, 129, 131.) Plaintiffs further allege that Defendants failed to properly monitor their investments in subprime-backed collateral debt obligations, reflecting significant "gaps in risk management expertise/experience" at UBS's investment bank. (Compl. ¶ 138; *see also id.* ¶¶ 134-137.) Plaintiffs argue that these internal failures, when taken with Defendants' failure

to act on external red flags signaling the impending collapse of the housing and subprime markets, sufficiently demonstrate an abuse of discretion. (Pls.' Opp'n at 29.)

Three recent cases within this district have addressed ERISA fiduciary duty claims arising out of a financial institution's failure to divest an employee retirement plan of company stock in the face of large losses resulting from investment in mortgage-backed securities. *See Bear Stearns*, 2011 WL 223540, at \*117; *Lehman Bros.*, 683 F. Supp. 2d at 297; *Citigroup*, 2009 WL 2762708, at \*4-5. In each of these cases, the district court granted the defendant's motion to dismiss, finding that the fiduciary's decision to maintain an employer stock fund as an investment option did not constitute an abuse of discretion.

In *Citigroup*, for example, the plaintiffs alleged that the defendants "engaged in a pattern of risky loan practices by marketing, purchasing, and originating subprime loans without adequate consideration[] of the borrower's ability to pay and with unreasonably high risk of borrower default." *Citigroup*, 2009 WL 2762708, at \*18 (internal quotation marks omitted). Such conduct, along with the defendants' investment in mortgage-related securities, resulted in "losses totaling tens of billions of dollars." *Id.* The court, however, rejected the plaintiffs' argument that, given Citigroup's substantial losses, the defendants' failure to remove the Citigroup Stock Fund from its employee retirement plan constituted an abuse of discretion:

> If true, [the plaintiffs'] allegations would constitute evidence supporting

the position that Citigroup adopted imprudent and risky business strategies that resulted in substantial losses to the company. But they would not suggest the type of dire situation that would have caused defendants to believe that continued adherence to the Plans' mandate regarding Citigroup stock was no longer in keeping with the settlor's expectations of how a prudent trustee would operate.

*Id.* (internal quotation marks omitted). The courts in *Bear Stearns* and *Lehman Brothers* reached similar results. *See Bear Stearns*, 2011 WL 223540, at \*136 ("While the ERISA Complaint alleges that Bear Stearns was mismanaged, experienced a substantial decline in its stock price, and was at risk of collapse, it does not carry the heavy burden required to establish that the [defendants] abused their discretion under *Moench* when they did not divest the Plan of Bear Stearns stock."); *Lehman Bros.*, 683 F. Supp. 2d at 301-02 (acknowledging that Lehman's bankruptcy filing means that "a corporate collapse was imminent at some prior point in time," but finding that the plaintiffs had failed to allege an abuse of discretion where the complaint only advanced "conclusory" allegations that "there were 'clear warning signs' of collapse and that defendants 'knew or should have known' about Lehman's true financial state throughout the class period").

Here, Plaintiffs' allegations fail to demonstrate an abuse of discretion for reasons similar to those articulated in *Citigroup*, *Bear Stearns*, and *Lehman Brothers*. Even if the allegations in the Complaint are sufficient to demonstrate that UBS's large losses could

10

have been mitigated by more responsible investing decisions, such a showing, in and of itself, is plainly inadequate to support an inference that "reasonable fiduciaries would have considered themselves bound to divest" the plans of the UBS Stock Fund. *Bear Steans*, 2011 WL 223540, at *134 (internal citation and quotation marks omitted).

Indeed, Plaintiffs' allegations with respect to UBS's financial difficulties do not rise to the level of the catastrophic failure necessary to overcome the presumption of prudence. Significantly, the alleged 69% drop in UBS's share price over the course of the class period is of similar magnitude to declines that other courts have held insufficient to overcome the *Moench* presumption. *See Bear Stearns*, 2011 WL 223540, at *135-36 (finding a drop in share price from $171 to under $5 was insufficient to overcome the *Moench* presumption because the company "did not collapse, and its stock did not become effectively worthless" (internal quotation marks omitted)); *Gearren*, 690 F. Supp. 2d at 259 (64.4% decline insufficient); *Citigroup*, 2009 WL 2762708, at *17 (52% drop insufficient); *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1096 (9th Cir. 2004) (75% drop insufficient); *Kuper v. Iovenko*, 66 F.3d 1447, 1451 (6th Cir. 1995) (80% drop insufficient). Notably, the court in *Lehman Brothers* found that Plaintiffs had failed to overcome the presumption of prudence where the company filed for bankruptcy during the class period. *See Lehman Bros.*, 683 F. Supp. 2d at 301.

Moreover, Plaintiffs have advanced no allegation making it plausible that UBS's solvency or viability as a going concern was ever realistically in jeopardy. Plaintiffs make

much of the $60 billion "bailout" provided by the Swiss government, arguing that were it not for that, UBS would have been rendered insolvent. Notwithstanding the speculation inherent in such an allegation, Plaintiffs' argument misapprehends the showing necessary to satisfy the abuse of discretion standard. Even if it were true that UBS would have been rendered insolvent without the intervention of the Swiss government, to overcome the presumption of prudence Plaintiffs would still have to allege that there was a point in time in which UBS's insolvency (or similarly dire condition) appeared imminent to Defendants. The Complaint contains no such allegations. Rather, it merely alleges, in conclusory fashion, that Defendants had a general awareness of the riskiness of the UBS investment strategies that ultimately put the Company in a position where it accepted financial assistance from the Swiss government. Such allegations fall well short of "persuasive and analytically rigorous facts" demonstrating an abuse of discretion. *Bear Stearns*, 2011 WL 223540, at *134.

Given that, throughout the class period, UBS never reached the brink of imminent collapse, there remained a possibility that the value of UBS stock would rebound. In light of this possibility, and given that each plan presupposed that the fiduciaries would make the UBS Stock Fund available to plan participants, Defendants cannot be said to have abused their discretion. To the contrary, had Defendants withdrawn the fund, and had the fund then rebounded, Defendants would likely have faced breach of fiduciary duty allegations for failing to carry out the settlors' intentions. As other courts have stressed, the duty of prudence does not require plan

11

fiduciaries to engage in such prognosticating. *See Kirschbaum*, 526 F.3d at 256 ("A fiduciary cannot be placed in the untenable position of having to predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded.").

Accordingly, as Plaintiffs have failed to plead facts sufficient to overcome the presumption of prudence, Count One of the Complaint fails as a matter of law.[16]

B. Count Two: Duty of Candor

Plaintiffs' second claim alleges that Defendants breached their fiduciary duty of candor "by failing to provide complete and accurate information regarding UBS Stock to the Plans' participants." (Pls.' Opp'n at 39; *see* Compl. ¶¶ 240-48.) Specifically, Plaintiffs argue that Defendants should have disclosed to plan participants the "significant risk[s]" posed by UBS's trading in subprime mortgage-backed securities and auction rate securities, as well as the potential liability the Company faced for its alleged role in providing tax evasion assistance to its wealth management customers. (*Id.*)

---

[16] Because the Court finds that Defendants' decision to continue offering the UBS Stock Fund was not imprudent, Plaintiffs' argument that Defendants also breached a duty to investigate fails. *See Citigroup*, 2009 WL 2762708, at *19 ("[S]ince plaintiffs have not . . . overcome the presumption that Citigroup stock was a prudent investment[,] plaintiffs cannot show that a failure to investigate led to any losses to the plan.")

As this Court noted in *Gearren* and *Wyeth*, ERISA does not impose an affirmative duty on fiduciaries to disclose information about the company's financial condition to plan participants. *See Gearren*, 690 F. Supp. 2d at 271-72; *Wyeth*, 2010 WL 1028163, at *7. Plaintiffs acknowledge as much and do not allege that Defendants made affirmative misstatements to plan participants in a fiduciary capacity. (Pls.' Opp'n at 39 n.47.) Instead, Plaintiffs contend that this Court's rulings in *Gearren* and *Wyeth* were "in error" and that the duty of candor does, in fact, require an ERISA fiduciary to disclose to plan participants material information relating to the company's financial condition. (*Id.*) Given that the weight of authority in this Circuit is in accord with *Gearren* and *Wyeth*, the Court declines to reverse its position on this issue. *See Bd. of Trs. of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 147 (2d Cir. 1997) ("[W]e think it inappropriate to infer an unlimited disclosure obligation [under ERISA] on the basis of general provisions that say nothing about disclosure."); *Citigroup*, 2009 WL 2762708, at *22 (rejecting the suggestion that a fiduciary must volunteer financial information about companies in which participants may invest because "fiduciaries do not have a duty to give investment advice or to opine on the stock's condition" (internal quotation marks omitted)).

To the extent that Plaintiffs suggest that Defendants' duty of candor was breached because each plan's documents made reference to SEC filings and press releases that allegedly contained misstatements and omissions, such an argument also fails as a matter of law. As an initial matter, Plaintiffs fail to allege, with any degree of specificity,

the nature of these alleged misrepresentations. To the contrary, the Complaint makes conclusory assertions of the Company's failure to disclose its "deceitful business practices" and its "serious mismanagement and improper business practices." (*See* Compl. ¶¶ 185-87, 189-92, 244.) Such sweeping generalizations are not sufficient to give rise to a plausible inference that UBS's SEC filings contained misrepresentations. *See Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374, 388 (S.D.N.Y. 2010) (rejecting the plaintiffs' duty of candor claim where "plaintiffs have failed to point to any language in any summary plan description or any incorporated SEC filing made within the amended Class Period that is materially, misleading").

Even if UBS's SEC filings did contain misrepresentations, the Complaint nonetheless fails to sufficiently allege a breach of the duty of candor. "[S]tatements concerning a company's financial condition become subject to ERISA fiduciary duties only if they are made in an ERISA fiduciary capacity, which means that the statements are made by the plan administrator and are intentionally connected to statements regarding a plan's benefits." *Gearren*, 690 F. Supp. 2d at 272; *accord Varity v. Howe*, 516 U.S. 489, 504-05 (1996). As numerous courts in this district have held, "those who prepare SEC filings do not become ERISA fiduciaries through those acts and, 'consequently, do not violate ERISA if the filings contain misrepresentations." *Fisher*, 703 F. Supp. 2d at 388 (quoting *Citigroup*, 2009 WL 2762708, at *23). Nor do ERISA fiduciaries who incorporate SEC documents by reference into a summary plan description violate ERISA unless they "intentionally connect the content of those

SEC filings to statements about plan benefits." *Gearren*, 690 F. Supp. 2d at 273. Here, Plaintiffs have not alleged that the individuals who prepared the SEC filings were ERISA fiduciaries, let alone that they were acting in a fiduciary capacity when doing so. If any Defendant did, in fact, violate federal securities laws, he will be liable to Plaintiffs in their capacities as shareholders under those laws, but not under ERISA. *See id.* at 273.

Accordingly, because the Complaint fails to allege that any of the Defendants, in their capacities as ERISA fiduciaries, made misstatements or omissions that were intentionally connected to plan benefits, Defendants' motion to dismiss is granted with respect to Count Two.

### C. Count Four: Conflict of Interest

An ERISA fiduciary has a duty of loyalty requiring him to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

Plaintiffs argue that Defendants "placed their interests as directors and senior officers of UBS above the interests of the Plans and their participants." (Pls.' Opp'n at 42.) Plaintiffs allege that these conflicts led Defendants to (i) "fail to disclose adverse information to the Plans' participants," and (ii) "refrain from divesting the Plans of UBS Stock." (*Id.*; *see* Compl. ¶ 264.)

As evident from Plaintiffs' allegations, their claim for conflict of interest is essentially a rehashing of their duty of prudence and duty of candor claims, which

fail for the reasons stated above. To the extent that Count Four could be construed as an independent cause of action, it still fails to state a claim. Merely alleging, as Plaintiffs do, that a conflict of interests exists because Defendants were ERISA fiduciaries as well as corporate officers and directors is insufficient as a matter of law. *See Wyeth*, 2010 WL 1028163, at *7 ("'Mere officer or director status does not create an imputed breach of the duty of loyalty simply because an officer or director has an understandable interest in positive performance of company stock.'" (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 n.6 (4th Cir. 2007))); *In re WorldCom*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) (noting that it is not uncommon for an ERISA fiduciary to "have financial interests adverse to beneficiaries").

Accordingly, as Plaintiffs have alleged no facts suggesting that Defendants, in their capacities as ERISA fiduciaries, were conflicted, Count Four is dismissed.

### D. Counts Three, Five, and Six: Secondary Liability

Counts Three, Five, and Six attempt to hold Defendants liable for the purported breaches of their co-Defendants. Because Plaintiffs have failed to state a claim for breach of the duties of prudence and candor, as well as for conflict of interest, they have likewise failed to state a claim under any of their theories of secondary liability. Thus, Counts Three, Five, and Six must also be dismissed. *See Gearren*, 2010 WL 532315, at *16.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Consolidated Class Action Complaint is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 45 and close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: March 24, 2011
New York, New York

* * *

Plaintiffs are represented by Thomas James McKenna, Gainey & McKenna, LLP, 295 Madison Avenue, New York, NY 10017; David Lloyd Wales, Mark Rifkin, and Martin E. Restituyo, Wolf Haldenstein Adler Freeman & Herz LLP, 270 Madison Avenue, New York, NY 10016; Todd S. Collins, Berger & Montague, P.C., 1622 Locust Street, Philadelphia, PA 19103; Jeffrey Alan Klafter, Klafter, Olsen & Lesser, LLP, 2 International Drive, Suite 350, Rye Brook, NY 10573; and Ellen T. Noteware, Berger & Montague, P.C., 1622 Locust Street, Philadelphia, PA 19103. Defendants are represented by Robert Joseph Giuffra, Jr., Maite Aquino, Matthew Alexander Schwartz, and Suhana S. Han, Sullivan & Cromwell, LLP, 125 Broad Street, New York, NY 10004.

14

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/24/11